SHIPLEY et al. v. PITTSBURGH & L. E. R. CO.

Civ. A. No. 5586.

United States District Court
W. D. Pennsylvania.

March 8, 1949.

See also 7 F.R.D. 744.

A. E. Kountz, and Alexander Unkovic (of Kountz, Fry, Staley & Meyer), both of Pittsburgh, Pa., for plaintiffs.

James R. Orr and Donald B. Heard (of Reed, Smith, Shaw & McClay), both of Pittsburgh, Pa., for defendant.

Willard H. McEwen (of Mulholland, Robie, & McEwen), of Toledo, Ohio, for Railway Labor Executives' Ass'n.

Kenneth F. Burgess, Douglas F. Smith, Howard Neitzert and Martin M. Lucente (of Sidley, Austin, Burgess & Harper),

all of Chicago, Ill., for Railroad Committees.

GOURLEY, District Judge.

This is an action on collective bargaining agreements negotiated and executed by the employees' representatives of The Pittsburgh and Lake Erie Railroad Company with said Company. It presents for decision novel and important questions arising out of said contracts which were negotiated and executed in accordance with the provisions of the Railway Labor Act, June 7, 1934, c. 426, 48 Stat. 926, June 21, 1934, c. 691, § 1, 48 Stat. 1185, June 25, 1936, c. 804, 49 Stat. 1921, Aug. 13, 1940, c. 664, §§ 2, 3, 54 Stat. 785, 786, 45 U.S.C.A. § 151 et seq.

The contracts or bargaining agreements which are involved in this proceeding were negotiated and executed on January 12, 1928 and November 17, 1936. The plaintiff employees were represented by the Brotherhood of Railroad Trainmen (BRT), and the Order of Railway Conductors (ORC) in the 1928 Contract, and the Order of Railway Conductors in the 1936 Contract.

■ Under the Railway Labor Act which sets up the procedure and method by which an employee of a carrier, who is aggrieved concerning his labor relations, may submit the grievance to the Railroad Adjustment Board, the remedy afforded is not exclusive and the employee may bring suit at law to settle a dispute without first submitting the controversy to the Board. 45 U.S.C.A. § 151 et seq. There is nothing in the Act which purports to take away from the courts the jurisdiction to determine a controversy or to make an administrative finding of the Board a prerequisite to filing a suit in court. Kelly v. Nashville C. & St. L. R., D. C., 75 F.Supp. 737; Adams et al. v. New York C. & St. L. R. Co., 7 Cir., 121 F.2d 808, 810; Moore v. Illinois Cent. R. Co., 312 U.S. 630, 61 S.Ct. 754, 85 L.Ed. 1089; Beeler v. Chicago, R. I. & P. Ry. Co., 10 Cir., 169 F.2d 557; Union Pacific R. Co. v. Olive, 9 Cir., 156 F.2d 737.

The ultimate issues relate to:

(a) The interpretation and construction of the 1928 and 1936 Contracts.

(b) The authority of the collective bargaining representative (BRT) to compromise or settle accrued claims of the plaintiffs who—

(1) were members of the collective bargaining representative and

(2) were not members of the collective bargaining representative.

### Parties to Suit
### Plaintiffs

The plaintiffs are 133 conductors (also known as yard foremen) and brakemen (also known as helpers) who are and for a long time have been employees of The Pittsburgh and Lake Erie Railroad Company, defendant. They are called, generally in railroad parlance, "trainmen."

The major question involved relates to whether the plaintiffs were or were not entitled to extra pay from defendant at the rate of an additional day for each day in which the plaintiffs coupled air hose at points where air or car inspectors were available. The rights of action of the plaintiffs are based upon either, or both, of two certain written collective bargaining or employment contracts which contain the same provisions as to the basic claims of the plaintiffs.

(a) Claims of three of the plaintiffs are based exclusively upon a contract executed in 1936 by the defendant railroad with the Order of Railway Conductors, the certified bargaining agent of the conductors during the entire period covered by this suit.

(b) Claims of eighty-seven of the plaintiffs are based upon a contract made in 1928 by the defendant corporation with the Order of Railway Conductors and the Brotherhood of Railroad Trainmen.

(c) Twenty of the plaintiffs were conductors who were engaged partly in road work and partly in yard work, and thus their claims are in part under one of the said contracts and in part under the other.

(d) Twenty-three of the plaintiffs were conductors who were engaged partly in yard work and partly on work trains (that being a class of road work), so that those twenty-three plaintiffs—as do the twenty plaintiffs last above mentioned—claim in part under one of said contracts and in part under the other.

A summary of the numbers of the foregoing groups is as follows:

| Group | Number of Plaintiffs |
|---|---|
| Road service exclusively, all claims under the 1936 contract | 3 |
| Yard service exclusively, all claims under the 1928 contract | 87 |
| Both road and yard service, claims under both contracts | 20 |
| Yard service and work train (type of road service), claims under both contracts | 23 |
| Total number of plfs. | 133 |

### Historical Background of Defendant

Since 1879 The Pittsburgh & Lake Erie Railroad Company has owned, operated and maintained a railroad system, having one western terminus and two eastern terminii. Throughout the length of the railroad there are no considerable stretches of territory where there are no sidings or spurs required to effectively serve the industries and businesses adjacent to the track. The main line is approximately one hundred sixty-eight (168) miles in length.

The railroad system has been divided into three divisions, to wit, The Pittsburgh & Lake Erie, Monongahela, and Youghiogheny divisions.

The defendant railroad cannot be classified with the other two railroads supplying passenger and freight service to the Pittsburgh area, viz.: Pennsylvania and Baltimore and Ohio railroads which extend over a much greater territory. The tracks of both the Pennsylvania and The Baltimore and Ohio run for great stretches through territory where there is no industry. of any kind abutting the tracks, nor to which there are any sidings.

Prior to 1915 it was decided that for the efficient operation of the railroad and better service for its customers, the main line of the railroad should be divided into nine general yards. The limits of these yards were largely determined by the various concentrations of the mines, mills and factories that were served. In addition, the division of the railroad into general yards permitted the more effective assignment of yard crews to take care of certain blocks of work. Defendant railroad is unique among the trunk line railroads in the United States in being the only one whose main line trackage is divided into a series of nine contiguous general yards.

From 1940 through 1944 each of the general yards was under the jurisdiction of a separate general yardmaster. A general yardmaster has jurisdiction over all the train and engine yard forces, the breaking up and making up of trains, and the performance of the industrial work within the general yard limits. He is the highest operating officer in the general yard.

Each general yard contains smaller yards. The smaller yards within the general yards are under the immediate direction and control of trick or turn yardmasters, who are subordinate to the general yardmasters and who have jurisdiction over one or several of the smaller yards. A general yard is a section of yards from one point to another on the railroad, while a yard is one or more tracks or succession of tracks used for the make up and classification of trains and storage of cars.

### Services Involved
### "Coupling Air Hose"

The process of coupling air hose normally takes less than half a minute. The act of coupling air hose consists of joining the ends of two air hoses, the other ends being attached to an airline on each respective car, by putting the face of each hose against the other and giving them a twist so that they are locked together. The function of the air hose is to provide a continuous airline from the source of air supply (locomotive or stationary) to the car or cars for the operation of the air brake mechanism which is standard equipment on each car.

Before the air hoses are joined, each car must be coupled to the next one by means of couplers which protrude from the end of each car and fit together like bent fingers of one hand uniting with the bent fingers of the other. After the couplers are together, they are locked by a coupler pin which should automatically drop into place but

frequently does not, requiring manual adjustment. When a car or cars are to be coupled it is sometimes necessary for the trainman to properly adjust the position of the couplers in order that the coupling be made.

All of the plaintiffs, who were employed by defendant prior to 1928, coupled air hose almost daily. This occurrence existed from the first day they worked as trainmen. New trainmen were given a three day training period with experienced crews and learned from the older crew members how to couple air hose, open knuckles and set brakes. In addition, the trainmen received compulsory instructions on the air brake system, and rules and regulations concerning it.

### Classification of Employees Who Couple Air Hose "Trainmen"

The crews operating the freight trains over the yard territories described are divided into road crews and yard crews. Generally, if a trainman works on a train which takes him out of the switching limits of the general yard where he begins his work and into one or more other general yards, he is engaged in road service. A trainman is in yard service when he is engaged in the movement of a car or cars entirely within the switching limits of a single general yard. The switching limits of a general yard are not coextensive with its yard limits, but exceed them. (Thus, while the yard limits of New Castle general yard are only five and a half miles, the switching limits are nine miles.) Apart from engine service employees, each crew consists of three men; a conductor, brakeman and flagman on a road crew, and a foreman and two helpers on a yard crew. While the nomenclature varies, the duties are comparable..

The primary function of both road and yard crews is to directly handle the picking up, moving, setting off and switching of cars. In this process it is necessary, under certain circumstances, that the air hose between cars be coupled to provide braking facilities while the cars are in motion. There are no rules or regulations prescribed either by the Interstate Commerce Commission or railroad management that the air hose must be coupled except when the cars are being moved on or across the main tracks, over a public crossing or on steep grades. Thus, cars may be shifted around in yards without having air hose connected, provided the train is not operated over a public crossing.

In 1923, defendant instituted an apprentice system under which an inexperienced man was required to serve a three-day training period working with older men who told him how to couple air hose, open knuckles, set brakes and the like. Prior to 1930, all trainmen were required to take instructions on the air brake system, its manipulation, pertinent rules and regulations in a building at McKees Rocks, Pennsylvania. Subsequently, the equipment was placed in a car and moved from terminal to terminal; the receiving of instructions remained mandatory.

All cabooses on freight trains must contain, as standard equipment, a certain number of air hoses, air hose gaskets and a wrench for changing air hose, which equipment it is and was the duty of the conductor to obtain, keep on hand and use, to which requirement neither trainmen nor unions ever made objection.

### "Car Inspectors"

At many, but not at all, points within each of the general yards, car inspectors were located and had been long prior to 1915.

About ten percent (10%) of a car inspector's time is spent in coupling air hose and performing the tasks incident thereto, such as checking the angle cocks, cross-over pipes and air connections and applying the air and testing the brakes to ascertain that the brakes apply and release. If inspection reveals a defect which requires going under the car to repair it, the car inspector makes the repair but trainmen do not.

### Historical Background Of 1928 and 1936 Trainmen's Contracts

The various contracts were not hastily drawn. They were the product of considerable discussions and conferences, with extensive proposals and counter proposals, which finally culminated with written contracts being prepared, executed and approved by the respective parties. There is

no claim that there was any fraud or over-reaching by any of the parties, or that there was a mutual mistake.

The first contract between the trainmen and the defendant railroad was executed in 1888. Subsequent contracts were entered into between the defendant railroad and the trainmen up to and including the period involved in this action. Dates of contracts are as follows: 1891, 1894, 1900, 1902, 1906, 1907, 1910, 1912, 1915, 1920, 1924, 1928, and 1936.

█ In 1928 the Brotherhood of Railroad Trainmen represented a part, and the Order of Railway Conductors represented the balance, of all the yard and road freight service trainmen. The railroad was required by the Railway Labor Act to negotiate with these unions, and no other groups or individuals, a contract or contracts concerning rates of pay, rules and working conditions. See Virginia Railway Co. v. System Federation No. 40, Railway Employees' Department of the American Federation of Labor et al., 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789.

█ The two unions entered into negotiations looking toward a single joint contract between them and the men represented by them, and the defendant. The contract which resulted from these negotiations was binding on all members of the crafts represented, whether members of the union or not and regardless of whether the individual trainman was employed by defendant at the time of the execution of the contract or entered the employ of defendant during the life of the contract. Elgin, J. & E. Ry. Co. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L. Ed. 1886; Lewellyn v. Fleming, 10 Cir., 1946, 154 F.2d 211.

### Historical Background of Car Inspectors' Contracts

Car inspectors were not governed by either the 1928 or 1936 Contracts, or any other working agreements which related to trainmen.

Prior to December 5, 1921, the craft of carmen, which includes car inspectors and air inspectors, was not represented by any union and was working under an oral and not a written contract. On December 5, 1921, a written contract governing the terms and conditions of employment was executed by the defendant and a committee which represented all carmen employees. Subsequent agreements were made on behalf of the carmen by their bargaining representative, The American Federation of Railroad Workers, on July 1, 1923, October 1, 1926, and February 13, 1928. On May 1, 1948, the bargaining agreement of the carmen was executed by the United Railroad Workers of America, C.I.O., with the defendant.

At the time of the negotiation and execution of the contracts involved in this action, the car inspectors were governed by a working agreement which became effective on October 1, 1926, subsequently revised on February 13, 1928.

During the whole of the period involved in this action, April 1, 1940 to December 1, 1944, carmen were governed by the provisions of the bargaining agreement executed with defendant on February 13, 1928.

### History of Air Hose Rule in Trainmen's Contracts

█ While many railroad contracts contain an air hose rule, each such provision must be interpreted and construed against its own factual background. There has never been an air hose rule which was standard on all class "A" railroads throughout the United States. Some roads have no air hose rules, and there are wide variations in the rule from one road to another where such rules are in the contracts.

Although defendant had contracts with its train service employees as early as 1888, and trainmen had coupled air hose since before the turn of the century in yards where car inspectors were available, the first appearance in a train service employees' contract of any mention of air hose coupling occurred in 1915. Trainmen had been coupling air hose in smaller yards where car inspectors were available at times when the car inspectors were sitting idly in their shanties and doing nothing. The trainmen believed that the car inspectors were being remiss in their work. At that time the trainmen were represented by two unions, the Brotherhood of Rail-

road Trainmen and the Order of Railway Conductors, and the joint committee proposed to defendant on July 1, 1914 that a new rule be added to the contract to read as follows:

"At points where car inspectors or air inspectors are stationed, trainmen and yardmen will not be required to couple air or steam hose; if so required, they will be allowed actual time with a minimum of two hours."

At conferences between the joint committee and management representatives, management insisted that the word "stationed" was too broad, so the word "available" was substituted for "stationed." In addition, the penalty provision was withdrawn by the joint committee. The rule as it appeared in the 1915 contract read:

"At points where car inspectors or air inspectors are available, trainmen and yardmen will not be required to couple air or steam hose."

The 1915 agreement defined trainmen as conductors, flagmen, brakemen and train baggage masters, and defined yardmen as yard conductors and yard brakemen; it also provided, inter alia, as to "outside duties" that "regular trainmen or yardmen required to tend switches, watch crossings, or do any other work outside of their regularly assigned duties will be paid their regular wages, except when filling positions that pay a higher rate they shall receive the higher rate for the full day."

A new agreement was negotiated in 1920, which agreement changed the definition of trainmen to apply to conductors, ticket collectors, flagmen, brakemen, train baggage masters, yard foremen, yard helpers and switch tenders. Article 9 of the 1920 agreement, as to "outside duties," eliminated the words "regular trainmen or yardmen" from the 1915 agreement and substituted the word "trainmen" therefor and also added—

"(b) Trainmen will not be used to fire engines on outlawed trains tied up by law or for any other reason, or to take charge of engines when engine service employees are available. Where used, they will be paid a minimum of three hours at their regular rates per hour, plus what they would have earned in their regular service."

No change was requested or made in the provision relative to coupling air hose.

Although a new agreement was written in 1924, neither the BRT nor the ORC suggested a change in the "outside duties" or air hose rules, so they remained as they had been in the 1920 contract.

The 1924 Contract was superseded by the 1928 Agreement. All who took part in the negotiations preceding the 1928 Contract (both labor and management representatives) made no mention or discussed any penalty to be visited on the defendant for violation of the air hose rule. The only change in the rule proposed by the collective bargaining representatives, relating to the air hose rule, was to substitute "stationed" for "available," which request was refused. Article 9 of the 1924 Contract was reprinted verbatim as Article 11 in the 1928 Contract.

Following an election under the authority of the National Mediation Board on March 7, 1935, the BRT was certified as bargaining representative for road brakemen and flagmen, yard conductors and brakemen, train baggagemen and switch tenders, and the ORC was certified as representative of road conductors and ticket collectors. At a similar election on September 28, 1935, the ORC was certified as bargaining representative for yard conductors, thus leaving the BRT representing road brakemen and flagmen, yard helpers, train baggagemen and switch tenders. The ORC negotiated a separate contract with defendant on behalf of the employees represented by them, which contract became effective November 17, 1936. The air hose rule as it appeared in the 1928 contract was reprinted in the ORC 1936 Contract, with the exception that where the word "trainmen" appeared in the 1928 Contract, the words "conductors, assistant conductors or yard conductors" (yard foremen) were substituted. On February 8, 1939, after another election, the BRT was again certified as the bargaining agent for the yard conductors, thus leaving the ORC to represent only road conductors among freight trainmen. The ORC lost the right to represent road conductors on

July 18, 1945 when the BRT was certified as their bargaining representative.

### History of Air Hose Rule in Carmen's Contracts

The working agreement of the carmen which was in effect at the time of the negotiation and execution of the trainmen's contracts involved in this action, and during the period previous to the filing of this suit on December 1, 1944, contained the following terms and provisions as to the duties of car inspectors:

"Rule 27—Classification of Work.

"Carmen's work shall consist of building, maintaining, dismantling (except all-wood freight-train cars), painting, upholstering and inspecting all passenger and freight cars, both wood and steel, planing mill, cabinet and bench carpenter work, pattern and flask making and all other carpenter work in shops and yards, except work generally recognized as bridge and building department work, carmen's work in building and repairing motor cars, lever cars, hand cars and station trucks, building, repairing and removing and applying locomotive cabs, pilots, pilot beams, running boards, foot and headlight boards, tender frames and trucks; pipe and inspection work in connection with air brake equipment on freight cars applying patented metal roofing; operating punches and shears doing shaping and forming; work done with hand forges and heating torches in connection with carmen's work; painting with brushes, varnishing, surfacing, decorating, lettering, cutting of stencils and removing paint (not including use of sand blast machine or removing in vats); all other work generally recognized as painters' work under the supervision of the locomotive and car departments, except the application of blacking to fire and smoke boxes of locomotives in engine houses; joint car inspectors, car inspectors, safety appliance and train car repairers, oxyacetylene, thermit and electric welding on work generally recognized as carmen's work; and all other work generally recognized as carmen's work.

"It is understood that present practice in the performance of work between the carmen and boilermakers will continue."

"Rule 45—Car Inspectors.

"Employees assigned to the position of car inspector must be able to speak and write the English language and have proper knowledge of the Master Car Builders' Rules and Safety Appliance Laws, the management to be the judge."

The carmen's contracts also required protection for said employees while engaged in their employment.

"Rule 47—Protection for Repairmen.

"At points where there is a Foreman it shall be the duty of such Foreman and Inspectors and repairmen at work to know personally that cars being inspected or repaired are protected by day with a blue flag and at night with a blue flag and a blue lantern suspended therefrom.

"The flags will be made of light sheet iron eighteen (18) inches long and twelve (12) inches wide, secured to a piece of five-eighths (⅝) round iron, four (4) feet long, sharpened at the lower end. These flags must be placed in the center of the inspection or repair tracks, near the end and opposite the clearance point thereof, and driven securely into the earth or tie, so that there is no possibility of them being blown down. At any time that the flags become dim or defective, another one must be ordered from the Company, and the displaced one sent to the shops. It shall be the joint duty of the Foreman, Inspectors and repairmen to know personally that the flags are in good condition and that the lanterns are lighted at night and are in first-class condition to give light while being used."

This protection was made available to carmen while they were engaged in the coupling of air hose but the same or a similar protection was not set forth in the Trainmen's Contracts of 1928 or 1936, nor was it provided for them by the defendant.

It is apparent there is no express provision in said rules which requires or spells out in so many words that carmen are required to couple air hose. The last sentence in the first paragraph of Rule 27 states that carmen's duties shall also consist of the performance of work generally recognized as carmen's work. I further

cannot find any provisions in the Safety Appliance Laws which require car or air inspectors to couple air hose. However, it is a fact that carmen did engage in the coupling of air hose for some period of time prior to the negotiation and execution of their first bargaining agreement with the defendant, and under all of their subsequent bargaining agreements.

## History of Craft System and Basic Day Rule

The craft system and the basic day rule for each class of service requires explanation for those other than railroad people to understand.

### (a) Craft System—

Recognition is given by railroads and the employees' labor organizations that the training and experience of individuals engaged in various operations becomes highly specialized. Each class of employees has a high degree of training and drilling in doing the things which their work requires. The preservation of this specialized training with definite or limited duties is called the craft system. Each group of employees makes their career in their own craft, both for their own safety and their advancement. Also, this specialization contributes to the safety of railroading and the safety of the public. The high development of craft lines is accepted by both labor and management since railroading is somewhat hazardous, whether it be operation of trains, maintenance and repair of equipment, maintenance of rights of way, or any of the many and different types of work which must be performed in order to make possible the effective and safe operation of trains.

The craft system has grown to such strength as now to be unassailable. As to the statutory and judicial recognition of the craft system on railroads of the United States, see Railway Labor Act, 45 U.S.C. A. § 152. See also cases cited in pocket supplement to Title 45 § 152. Steele v. Louisville & N. R. Co., Ala.1944, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173; Switchmen's Union of North America v. National Mediation Board, 1943, 77 U.S.App.D.C. 264, 135 F.2d 785, reversed on other grounds 320 U.S. 297, 64 S.Ct. 95, 88 L. Ed. 61.

### (b) Basic Day Rule—

The underlying theory of the rule is that if, during the course of a day's tour of duty, a trainman does work both in and out of his craft, he is working under two contracts and is entitled to be paid under both contracts. He is, therefore, entitled to sixteen (16) hours' pay even though he worked but one hour (or one minute) under the contract outside his craft. It is, therefore, an incident and aids in making possible the preservation of the craft system.

The reasoning behind the rule was that if the employees would perform their duties in less than a given period of time, or hours, they would be paid their full day's pay. That when their work was completed if they were assigned to perform additional work, they would receive an additional day's pay for so doing.

That said rule helps both the employees and the railroads since it encourages the employees to expeditiously apply themselves, and the railroads get the work completed with greater dispatch and promptness.

Originally the basic day was twelve (12) hours or less, subsequently reduced to ten (10) hours or less, and prior to and at the time of the negotiation and execution of the trainmen's contracts in suit the basic day was eight (8) hours or less.

The terms of the contracts which the plaintiffs contend entitle them to recover provide as follows:

### 1928 Contract
#### "Article 11—Outside Duties

"(a) Trainmen required to tend switches, watch crossings or do any other work outside of their regularly assigned duties will be paid their regular wages, except when filling positions that pay a higher rate they shall receive the higher rate for the full day.

"(b) Trainmen will not be used to fire engines on outlawed trains tied up by law or for other reasons, or to take charge of engines when engine service employ-

ees are available. Where used, they will be paid a minimum of three hours at their regular rates per hour, plus what they would have earned in their regular service.

"Coupling Air and Chaining Cars

"(c) At points where car inspectors or air inspectors are available, trainmen will not be required to couple air or steam hose.

"Article 8—Basic Day and Overtime.

"(a) In all road service, except passenger service, one hundred miles or less, eight hours or less (straight-away or turn-around) shall constitute a day's work. Miles in excess of one hundred will be paid for at the mileage rates provided.

"Article 44—Basic Day.

"Eight hours or less shall constitute a day's work."

The 1936 Contract, except for the different designation of employees, has identical articles, more particularly Articles 11 (a), 11(b), 11(c), 8(a) and 44.

It is contended when Articles 11(a) and 11(c) are read with Articles 9(a) and 44 that if a trainman is required to couple air hose at points where car inspectors or air inspectors are available, he is entitled in payment therefor to an additional day's pay —that is, a day's pay in addition to the pay that he receives for doing his regular duties, and that day would be paid for at his trainman's rate of pay or the air inspector's or car inspector's rate, whichever is the higher.

In addition to the matters heretofore mentioned, the plaintiffs claim their position is supported by Award 8258 of the First Division of the National Railroad Adjustment Board.

This claim was filed by trainmen Hemphill and Wagner on March 16, 1941, and was consistently and wholly denied to be due by the defendant. It was processed by representatives of the Brotherhood of Railroad Trainmen and on July 19, 1943 the Board sustained the claim—

(a) Said award sustained the claim of the two trainmen for an additional day's pay for coupling air hose in a general yard where an air or car inspector was available.

(b) Neither Hemphill nor Wagner is a plaintiff in this action nor were any of the plaintiffs a party to said proceeding before the Board.

The defendant paid the award and the plaintiffs contend such action amounts to an admission of liability on the defendant's part as to all trainmen similarly situated.

General Theory of Plaintiffs' Action

It is claimed the plaintiffs coupled air hose during the period involved in this litigation, and in so doing under the provisions of the collective bargaining agreements a right exists to receive an additional day's pay for each day air hose was so coupled.

In coupling air hose the plaintiff trainmen state:

(a) They were engaged in work outside of their craft.

(b) They were engaged in work outside of their regular assigned duties.

(c) Under the provisions of the two contracts they were entitled to an additional day's pay.

(d) They were entitled to an additional day's pay, even if the contracts are interpreted to not so require, since a nationwide custom and practice existed among railroads and their employees that a trainman was to receive an extra day's pay when an act or work was performed specifically not required by the contract.

(e) That the nationwide custom and practice required the payment of an additional day's pay when the trainmen performed work of men in a different craft unless the contract fixed a different measure of pay; that the contracts in suit did not so provide a different measure of pay.

(f) That when the contracts in suit were negotiated and executed, the collective bargaining representatives and the company assented to, recognized and intended said custom and practice to be a part thereof.

(g) That an award of the First Division of the National Railroad Adjustment Board supports their right to recover.

(h) That subsequent to March 16, 1941 (the date of the filing of Hemphill-Wag-

ner claim), no defense exists as to custom to do the work as part of the regular assigned duties of trainmen.

(i) That the payment of said award by the defendant amounts to an admission of liability to the plaintiffs who are similarly situated.

(j) That a settlement made by the defendant with the trainmen and some of the plaintiffs subsequent to said Award is an admission of liability.

### General Reference to Defense

It is the contention of the defendant that none of the plaintiffs with the exception of C. P. Crane, R. J. Knechtel, F. E. Westcott, A. Gasper, C. Gough and R. C. Harris, trainmen, are entitled to recover, said admission of liability being based on a compromise agreement with the collective bargaining representatives of the employees contemporaneous with the negotiation and execution of a new contract effective December 1, 1944.

The defenses are:

(a) There are no provisions in the contracts which entitle the plaintiffs to recover and it was specifically so understood by the bargaining representative when the contracts were negotiated and executed.

(b) It was specifically understood that trainmen would not be paid for coupling air hose and that said work was part of their regular assigned duties.

(c) The plaintiffs have not proved a custom to exist that trainmen should be paid for coupling air hose.

(d) Trainmen have coupled air hose on the railroad long prior to 1915 when the air hose rule first appeared in defendant's contracts.

(e) Coupling air hose by trainmen was within the craft of trainmen.

(f) Coupling air hose was not confined to any specific craft.

(g) Coupling air hose was not the sole or individual responsibility of air or car inspectors.

(h) The basic day or additional day rule does not apply to coupling air hose.

(i) Any claims which the plaintiffs might have had are barred by agreement of their certified bargaining representatives.

There can be no doubt that each and every plaintiff is bound by the express terms of the 1928 Contract, with the exception of those plaintiffs who are making claim for services performed while they were road conductors, and they are governed by the express provisions of the 1936 Contract entered into between the Order of Railway Conductors and the defendant railroad. Since the pertinent provisions of the 1928 and 1936 Contracts differ only in the designation of the individuals affected by such provisions, all plaintiffs are equally governed by the same legal principles.

### Issues

I. Are any of the plaintiffs entitled to recover under the express provisions of the 1928 and 1936 Contracts?

II. If the contracts are construed by their express terms to not entitle the plaintiffs to recover, did a nationwide custom and practice exist that the parties recognized and intended to be a part of said contracts, which entitles the plaintiffs to an additional day's compensation for coupling air hose?

III. Does an award of the National Railway Adjustment Board, which sustained claims for coupling air hose under similar circumstances as that involved in this action, where none of the plaintiffs were parties thereto, require the Court to apply said award in disposing of the claims involved in the case at bar?

IV. Does payment of an award made by the National Railway Adjustment Board to the claimants involved therein, and the subsequent payment to employees similarly situated, amount to an admission of liability under the contracts in suit such as would entitle the plaintiffs to recover?

V. Does the settlement agreement executed by the bargaining representatives of the trainmen with the defendant relating to claims for air hose couplings bar the plaintiffs' right to recover where—

(a) Plaintiff trainmen were members of said bargaining agency (BRT)?

(b) Plaintiff trainmen were not members of said bargaining agency?

VI. Does the failure of plaintiff trainmen to comply with the terms of said

settlement agreement relating to services performed for air hose coupling bar them from the right to recover where—

(a) Plaintiff trainmen were members of said bargaining agency (BRT)?

(b) Plaintiff trainmen were not members of said bargaining agency?

VII. Does the acceptance by plaintiff trainmen of payments made by the defendant, under the provisions of said settlement agreement for coupling of air hose, bar their right to recover and amount to an accord and satisfaction?

VIII. Does the failure of plaintiff trainmen, who were members of the BRT, to follow the grievance procedures prescribed by the Constitution and By-Laws of said organization bar their right to recover?

### Discussion of Issues

Question I—Are any of the plaintiff trainmen entitled to recover under the express provisions of the 1928 and 1936 Contracts?—

The 1928 and 1936 Contracts, upon which this cause of action is based, were executed in Pennsylvania.

■ Where jurisdiction of a federal court in suit for breach of contract is based on diversity of citizenship, and the contract was executed in the state of Pennsylvania, the law to be applied is the law of Pennsylvania, including its rules on conflict of laws. Atlas Trading Corporation v. S. H. Grossman, Inc., 3 Cir., 169 F.2d 240; Klaxon Co. v. Stenter Electric Mfg. Co., 1946, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; New York Life Ins. Co. v. Levine, 3 Cir., 1943, 138 F.2d 286; Chicago Pneumatic Tool Co. v. Ziegler, 3 Cir., 1945, 151 F.2d 784.

In this proceeding there were originally twenty-four named plaintiffs, each of whom possessed the requisite qualifications of diversity of citizenship and claims in excess of $3,000.00. Leave was subsequently granted additional plaintiffs the right to intervene. See D.C., 68 F.Supp. 395; 70 F.Supp. 870; 7 F.R.D. 33.

■ Federal jurisdiction being based solely on diversity of citizenship as to the original plaintiffs, the same rules of law would have application to those plaintiffs who have been granted leave to intervene.

■ Under the Pennsylvania Conflict of Laws Rule the interpretation of a contract is determined by the law of the place of contracting. New York Life Ins. Co. v. Levine, supra; Newspaper Readers Service v. Canonsburg Pottery Co., 3 Cir., 1945, 146 F.2d 963.

■ In Pennsylvania a contract is made when and where the last act necessary for its formation is done. Newspaper Readers Service v. Canonsburg Pottery Co., supra; Ward Lumber Co. v. American Lumber & Mfg. Co., 247 Pa. 267, 93 A. 470, Ann.Cas.1918A, 451.

■ The interpretation of said contracts is, therefore, governed by the law of Pennsylvania.

Counsel for the party litigants have been most vigorous, searching and thorough in the trial of this proceeding, and have presented a most learned and carefully annotated argument in support of their respective positions.

Consideration must first be given to the express terms of the contracts which relate to the claims.

### 1928–1936 Contracts
"Article 11—Outside Duties.

"(a) Trainmen required to tend switches, watch crossings or do any other work outside of their regularly assigned duties will be paid their regular wages, except when filling positions that pay a higher rate they shall receive the higher rate for the full day.

"(b) Trainmen will not be used to fire engines on outlawed trains tied up by law or for other reasons, or to take charge of engines when engine service employes are available. Where used, they will be paid a minimum of three hours at their regular rates per hour, plus what they would have earned in their regular service.

"Coupling Air and Chaining Cars.

"(c) At points where car inspectors or air inspectors are available, trainmen will not be required to couple air or steam hose."

#### 1928 Contract

"Article 8—Basic Day and Overtime.

"(a) In all road service, except passenger service, one hundred miles or less, eight hours or less (straight-away or turn-around) shall constitute a day's work. Miles in excess of one hundred will be paid for at the mileage rates provided.

"Article 44—Basic Day.

"Eight hours or less shall constitute a day's work."

#### 1936 Contract

"Article 9—Basic Day and Overtime

(a) In all road service, except passenger service, one hundred miles or less, eight hours or less (straight-away or turn around) shall constitute a day's work. Miles in excess of one hundred will be paid for at the mileage rates provided.

"Article 44—Basic Day—Yard Service

"Eight hours or less shall constitute a day's work."

The Court is not dealing with the interpretation of a statute, but of labor bargaining agreements or contracts.

When the 1928 and 1936 Contracts were negotiated and executed, under the provisions of the Railway Labor Act the duty was imposed on the defendant to meet and bargain with the employees through their collective bargaining representatives which were the Brotherhood of Railway Trainmen and the Order of Railway Conductors. National Labor Relations Board v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682.

■ Contract in labor law is a term the implications of which must be determined from the connection in which it appears. Collective bargaining between employer and the representatives of. a unit, usually a union, results in an accord as to terms which will govern hiring and work and pay in that unit. The result is not, however a contract of employment except in rare cases; no one has a job by reason of it and no obligation to any individual ordinarily comes into existence from it alone. The negotiations between union and management result in what often has been called a trade agreement, rather than a contract of employment. Without pushing the analogy too far, the agreement may be likened to the tariffs established by a carrier, to standard provisions prescribed by supervising authorities for insurance policies, or to utility schedules of rates and rules for service, which do not of themselves establish any relationships but which do govern the terms of the shipper or insurer or customer relationship whenever and with whomever it may be established. Indeed, in some European countries, contrary to American practice, the terms of a collectively negotiated trade agreement are submitted to a government department and if approved become a governmental regulation ruling employment in the unit. J. I. Case Co. v. National Labor Relations Board, 321 U.S. 332, 334 et seq., 64 S.Ct. 576, 88 L.Ed. 762.

■ After the collective trade agreement is made, the individuals who shall benefit by it are identified by individual hirings. The employer, except as restricted by the collective agreement itself and except that he must engage in no unfair labor practice or discrimination, is free to select those he will employ or discharge. But the terms of the employment already have been traded out. There is little left to individual agreement except. the act of hiring. This hiring may be by writing or by word of mouth or may be implied from conduct. In .the sense of contracts of hiring, individual contracts between the employer and employee are not forbidden, but indeed are necessitated by the collective bargaining procedure. J. I. Case Co. v. National Labor Relations Board, supra.

But, however engaged, an employee becomes entitled by virtue of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., somewhat as a third party beneficiary to all benefits of the collective trade agreement, even if on his own he would yield to less favorable terms. J. I. Case Co. v. National Labor Relations Board, supra.

■ The terms of a collective bargaining agreement between a railroad and its employees cannot be superseded or expanded by contracts with individual employees, even though such individual contracts are only with a few employees specially or uniquely situated. J. I. Case Co. v. Nation-

al Labor Relations Board, supra; Order of Railroad Telegraphers v. Railway Express Agency, 321 U.S. 342, 64 S.Ct. 582, 88 L.Ed. 788.

■ A collective bargaining agreement or employment contract, such as the contracts under which the plaintiffs worked, is required by law to be in writing. J. I. Case Co. v. National Labor Relations Board, supra; Order of Railroad Telegraphers v. Railway Express Agency, supra; H. J. Heinz v. National Labor Relations Board, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309.

■ Collective bargaining agreements are no less contracts simply because they are arrived at after bargaining between an employer and representatives of a collective group.

■ Where the language of a contract is plain and unambiguous, the court will not resort to construction but will enforce the contract according to its terms. New York Life Ins. Co. v. Jackson, 304 U.S. 261, 58 S.Ct. 871, 82 L.Ed. 1329; Great Lakes Towing Co. v. Bethlehem Transportation Corporation, 6 Cir., 1933, 65 F.2d 543; Provident Trust Co. of Philadelphia v. Metropolitan Casualty Ins. Co., 3 Cir., 1945, 152 F.2d 875; General Finance Co. v. Pennsylvania Threshmen & Farmers' Mutual Casualty Ins. Co., 348 Pa. 358, 35 A.2d 409.

■ Where the rights of respective parties are dependent upon a contract, unless that instrument is ambiguous, the intention of the parties must be determined by the words of the contract, unaided by oral testimony. Rock-Ola Mfg. Corporation et al. v. Filben Mfg. Co. et al., 8 Cir., 168 F.2d 919.

■ In determining whether or not there is an ambiguity requiring an interpretation, the whole contract must be considered and not an isolated part. Buchanan v. Swift, 7 Cir., 1942, 130 F.2d 483; Fraser Fund v. Fraser, 350 Pa. 553, 40 A.2d 22; De Chicchis v. School District of Borough of Elizabeth, 142 Pa.Super. 94, 15 A.2d 492.

■ A contract is ambiguous if, and only if, it is reasonably or fairly susceptible of different constructions; it is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends. 17 C.J.S., Contracts, § 294 and cases there cited; Whiting Stoker Co. v. Chicago Stoker Corporation, 7 Cir., 171 F.2d 248; Zehnder v. Michaud, 8 Cir., 145 F.2d 713.

Contracts are not rendered ambiguous by the mere fact that the parties do not agree upon their proper construction. An ambiguous contract is one capable of being understood in more senses than one; an agreement obscure in meaning, through indefiniteness of expression, or having a double meaning. Contracts are not rendered ambiguous by the mere fact that parties do not agree upon their proper construction. Whiting Stoker Co. v. Chicago Stoker Corporation, supra.

■ Where a contract is ambiguous, evidence of extrinsic circumstances may be received to show that the parties themselves have adopted a permissible method of applying its terms to the subject matter. Zehnder v. Michaud, supra.

■ Where parol evidence is admissible to alter the terms of a written contract, it must first appear that the contract is incomplete and that the evidence sought to be introduced in nowise conflicts with what is written. American Sumatra Tobacco Corporation v. Willis, 5 Cir., 170 F.2d 215.

■ The courts are not permitted to make contracts for party litigants and are only empowered to construe the language and meaning of contracts made and entered into as they are intended and understood by the parties. In the absence of fraud, accident or mistake, parol evidence is not admissible to vary, alter or contradict terms of a complete and unambiguous written contract. American Sumatra Tobacco Corporation v. Willis, supra.

■ This is not a case where the parties are just unable to agree upon the proper construction to be placed on the contracts in suit. A situation exists where the contracts are capable of being understood in more senses than one; they are

742

obscure in meaning, through indefiniteness of expression. Since the contracts are ambiguous, that is, the language used is reasonably susceptible of more than one meaning, it is the duty of the court to determine the intent of the parties.

There is no question in my mind that language used in railroad agreements and contracts is peculiar and unique to the railroad industry. Of course, it is English, but it is a peculiar brand in many respects. There are words which have specialized meanings within the context or framework of railroad practice and what might be called railroad jargon.

██ The admission of parol evidence in this proceeding, both as to the plaintiffs and the defendant, was not to contradict or vary the terms of the written agreements. As to the plaintiffs, it was for the purpose of explaining the meaning of the contracts and the effect thereof by witnesses who were ably qualified to express their opinions. In connection with the defendant, it was permitted to show the circumstances surrounding the negotiations and execution of the contracts in order to determine the intention of the parties. In each instance the parol testimony was proper and necessary; otherwise the Court could not have seen the trees due to being in the forest.

The experts called by the plaintiffs were thoroughly familiar with working agreements between employees and railroads generally in the United States; but they were not informed as to the detailed physical conditions which existed on the defendant railroad.

Testimony offered by those acquainted with railroad parlance and the administration by the Railroad Adjustment Board is of peculiar and unexplainable value.

Such testimony brings to the court the weight of decision on facts and law by men experienced in contracts, disputes and proceedings of this special and complicated character. The whole adjustment procedure up to the point of award, findings and order by the Railway Labor Board appears to be constructed upon the idea that it is not the business of lawyers, but is the business of railroad men, workers and managers alike. That does not make their findings and decisions less probative; rather it should make them more so. They know the language, functions and purposes of railroads and of their collective agreements. Their judgment is informed by experience in negotiating and administering these contracts. Because of this, they, perhaps better than lawyers, are qualified to interpret and supply them. Whether so or not, their judgment should carry weight when the judicial stage of controversy is reached. It cannot be assumed, therefore, that the findings have no substantive effect, merely because they were not given finality, as to either facts or law. They are probative, not merely presumptive in value, having effect fairly comparable to that of expert testimony. Washington Terminal Co. v. Boswell, et al., 75 U.S.App.D.C. 1, 124 F.2d 235, 241.

██ A witness possessed of special training, experience, or observation in respect to the matter under investigation may testify as to his opinion when it will tend to aid in reaching a correct conclusion. Where a written contract contains words or expressions of a technical nature employed in a particular business or industry, persons familiar with such business or industry may testify as to whether the words or expressions used have acquired a well-recognized meaning among those engaged in such business or industry, and if so, what it is, for the purpose of aiding the court in ascertaining the intentions of the parties to the contract. United States Smelting Co. v. Parry, 8 Cir., 166 F. 407, 410, 411; Farris v. Interstate Circuit, 5 Cir., 116 F.2d 409, 412; Eustis Packing Co. v. Martin, 5 Cir., 122 F.2d 648, 649; Securities and Exchange Commission v. Thomasson Panhandle Co., 10 Cir., 145 F.2d 408; Cf. Cooper v. Ohio Oil Co., 10 Cir., 108 F.2d 535; Manhattan Oil Co. v. Mosby, 8 Cir., 72 F.2d 840, 845; United States v. Stone and Downer Co., 274 U.S. 225, 245, 47 S.Ct. 616, 71 L.Ed. 1013; United States Industrial Chemicals v. Carbide & Carbon Chemicals Corporation, 315 U.S. 668, 678, 62 S.Ct. 839, 86 L.Ed. 1105; Pennsylvania Trial Evidence, Second Edition, by George M. Henry of the Philadelphia Bar, page 264; Purcell v. Metropolitan Life Ins. Co.,

332 Pa. 535, at page 537, 3 A.2d 340; Thorn Hill Oil Co. v. Ft. Pitt Gas Co., 202 Pa. 416, 51 A. 981; Clayton Electric Co. v. McKeesport & W. Ry. Co., 179 Pa. 350, 36 A. 287; Mudano v. Philadelphia Rapid Transit Co., 289 Pa. 51, 137 A. 104; Phillips Petroleum Co. v. Payne Oil Corporation, 10 Cir., 146 F.2d 546, 547.

The plaintiffs contend that the language of the two contracts, more particularly Articles 11(a) and 11(c), clearly establishes that in coupling air hose plaintiffs were working outside of their regular assigned duties, and not within their craft. That in either event and without splitting hairs to determine one or the other, or both, the plaintiffs come within the additional day principle, whether the term "craft" or "regular assigned duties" is considered. That when Articles 11(a) and 11(e) of the 1928 and 1936 Contracts are read and considered with Articles 8(a) and 44 of the 1928 Contract or Articles 9(a) and 44 of the 1936 Contract, it means that the trainmen are entitled to an additional day's pay for coupling air hose where car inspectors were available.

The defendant offered testimony of various representatives of the bargaining agency and the defendant who took part in the negotiation and execution of the 1928 and 1936 Contracts, and the bargaining agreements prior thereto. Such testimony was relevant not only for the purpose of assisting the Court in arriving at the intention of the parties, but for the same reasons which expert testimony was offered by the plaintiffs; that is, to explain the meaning of the terms and provisions of the contracts.

As I have heretofore stated, the terms of the contracts are not plain and unambiguous in railroad parlance and where the meaning of a contract is not clear, parol evidence is admissible to determine the intent of the parties. Hollander et al. v. Friedman, infra; Restatement, Contracts, Section 235(e); Williston on Contracts, Revised Edition, Vol. 3, Section 623, pp. 1792–1795.

A witness may be competent to testify as an expert witness even though his knowledge was acquired through the medium of practical experience rather than scientific duty and research. A witness is an expert witness and qualified to give expert testimony if the judge finds that to perceive, know or understand the matter concerning which the witness is to testify there is required special knowledge, skill, experience or training, and that the witness has the requisite special knowledge, skill, experience or training. Bratt v. Western Air Lines, 10 Cir., 155 F.2d 850, 166 A.L. R. 1061; Wigmore on Evidence 2d, Vol. 1, para. 561.

The defendant contends:

1. That the express terms of Article 11(a) destroy the effort to use it as a basis for implying an extra day's pay penalty.

"Article 11.—Outside Duties.

"(a) Trainmen required to tend switches, watch crossings or do any other work outside of their regularly assigned duties will be paid their regular wages, except when filling positions that pay a higher rate they shall receive the higher rate for the full day."

That, in unmistakable words, is a specific measure of compensation for trainmen who do any other work outside their regularly assigned duties.

2. That under the caption "Outside Duties" is a specific and unequivocal statement of the measure of compensation for those who work outside their assignment.

3. That there is nothing ambiguous about Article 11(a)—it means precisely what it says. It means, for example, that if a yardman working as such were required to tend switches part of the day, he would be paid the higher rate for the full day or his yardman's rate for the entire day.

4. That the parties who wrote the contract knew how to provide for additional compensation when it was intended. The words "additional" and "plus" in connection with compensation appear throughout the 1928 Contract, for example, Articles 5, 7, 11(b), 22(a), (b), (c) and (d) and 48(b).

5. That Article 11(c) of the 1928 Contract was not intended to nor did it impose any monetary liability on defendant if trainmen were required to and did couple

air hose at points where car inspectors or air inspectors were available. The parties who negotiated the contract were not novices at collective bargaining. In 1915, 1920 and 1924 the same two unions had negotiated contracts with the defendant and had made many changes in such contracts, resulting in increased financial advantages to the trainmen employees. If Article 11(c) had been intended to carry with it a penalty on the company for its violation, the parties well knew how to provide for such a penalty.

Plaintiffs answer and say that the air hose rule placed all air hose coupling outside the work of trainmen, and for the performance of which they were entitled to an additional day's pay. They stated that "point" was co-extensive with "general yard," and that "available" was synonymous with "stationed", "maintained" and "employed." Since defendant had admitted that at least one car inspector was on duty at some point, but not at all points, within the limits of each general yard twenty-four hours a day from April 1, 1940 to December 1, 1944, and since the entire railroad system is, for all practical purposes, a series of contiguous general yards, under the reasoning of plaintiffs' experts it necessarily follows that trainmen who coupled air hose during that period were performing outside duties no matter where or under what circumstance they performed a coupling.

■■ Reading into a contract the true meaning of technical terms, familiar to and used by the parties to a contract, is in no sense supplying by parol a missing term of the agreement. Such trade usage or meaning is supposed to have been in the minds of the parties when the contract was made, and hence the real meaning of the words becomes a part of the contract. Neither the parol evidence rule nor the statute of frauds is violated by reading into a contract a translation of technical terms used, into words of general understanding. Franklin Sugar Refining Co. v. William D. Mullen Co., 3 Cir., 12 F.2d 885, 887.

■■ The principles of construction of written contracts are well established and defined. The primary rule of construction is that a contract must be construed to give effect to the mutual intention of the parties at the time of entering into the contract. O'Boyle v. Home Life Ins. Co., D.C.Pa.1937, 20 F.Supp. 33; Salant v. Fox, 3 Cir., 1921, 271 F. 449; Wiegand v. W. Bingham Co., 6 Cir., 1939, 106 F.2d 546; Wiegand v. Wiegand, 1944, 349 Pa. 517, 37 A.2d 492; Slonaker v. P. G. Publishing Co., 1940, 338 Pa. 292, 13 A.2d 48; Hild v. Dunn, 1933, 310 Pa. 289, 165 A. 228.

■■■ The intention of the parties to a contract is, of course, an important guide to the correct interpretation of its meaning. It is true, not infrequently, such intention is best evidenced by the relevant conduct of the parties themselves pursuant to their common understanding of their respective contractual rights and liabilities. The construction which the parties place on their contract, however, has interpretive legal bearing only where the language of the contract is of a doubtful or an ambiguous meaning. Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent. Atlantic Refining Co. v. Wyoming Nat. Bank, 356 Pa. 226, 233, 51 A.2d 719, 170 A.L.R. 1060.

■■ While the intention of the parties and the meaning of the contract are gathered primarily from the contents of the writing itself, Albright v. Kalbitzer, D.C. Pa.1945, 62 F.Supp. 815; Robinson v. Stover, 1936, 320 Pa. 308, 182 A. 145; Blosser v. Enderlin, 1925, 113 Ohio St. 121, 148 N.E. 393, the words of a contract will be given a reasonable construction, a construction most equitable to the parties which would not give one of them an unfair or unreasonable advantage over the other. Hindman v. Farren, 1945, 353 Pa. 33, 44 A.2d 241; Navarro Corporation v. School District of Pittsburgh, 1942, 344 Pa. 429, 25 A.2d 808; Ohio Crane Co. v. Hicks, 1924, 110 Ohio St. 168, 143 N.E. 388.

■■ If a contract is susceptible of more than one construction, it will be construed in the light of the circumstances surrounding the parties at the time it was made, the necessities for which they naturally provided and the advantages each probably sought to secure. Westchester Fire Ins.

Co. v. John Conlon Coal Co., 3 Cir. 1937, 92 F.2d 160; In re Baxter, 6 Cir., 1939, 104 F.2d 318; City of Philadelphia v. Philadelphia Transportation Co., 1942, 345 Pa. 244, 26 A.2d 909; it being the right and duty of the court to place itself as nearly as may be in the situation of the parties so as to view the circumstances as they viewed them and so to judge the meaning of the words and the correct application of the language. Peebles v. Prudential Ins. Co., 6 Cir., 1940, 110 F.2d 76; Ohmer v. Allen, 6 Cir., 1935, 79 F.2d 942; Salant v. Fox, supra; Shallcross v. Highway Trailer Co., 1942, 147 Pa.Super. 279, 24 A.2d 71.

■ Where the parties to a contract have given it a practical construction by their conduct or course of dealing, such interpretation will be adopted by the court. Reynolds Metal Co. v. Skinner, 6 Cir., 1948, 166 F.2d 66; Federal Surety Co. v. A. Bentley & Sons Co., 6 Cir., 1931, 51 F.2d 24, 78 A.L.R. 1041; United States National Bank in Johnstown v. Campbell, 1946, 354 Pa. 483, 47 A.2d 697; Alpha Claude Neon Corporation, for Use of Pittsburgh Outdoor Advertising Co., v. Pennsylvania Distilling Co., 1936, 325 Pa. 140, 188 A. 825; Hollander et al. v. Friedman, 360 Pa. 20, 59 A.2d 892.

The facts are that trainmen were required to and did couple air hose long before 1915, when the air hose rule first appeared in defendant's working agreements, and they have continued to be required to couple air hose under all subsequent contracts, 1920, 1924, 1928, 1936, up to and including the present, under some conditions without being compensated. That they had been required to do this work was taken into account when the union negotiated the contracts, for all of the rules in the working agreements were reviewed by the bargaining representatives of the employees in the light of practice prior to and during the renegotiating of such agreements. The employees also knew that coupling air hose was part of their tasks: New employees were given three days of training with older crew members, learning how to couple air hose, open knuckles, set brakes and the like; all trainmen received compulsory instruction on the air brake system and the pertinent rules and regulations; the testimony undeniably established that trainmen coupled air hose on defendant's railroad from the first day they worked. Coupling air hose was a task whose nature was taken into account when the wage and employment conditions of trainmen were established.

Measured by these canons of construction, there can be but one conclusion as to the air hose rule in the 1928–1936 Contract —there was no penalty for its violation. Taking into consideration the history of the rule, the course of work, the railroad operations prior to and under the rule, union action in connection with the rule, the language of the contract and the practical construction thereof by the parties to the contract as evidenced by their course of conduct from 1915 to 1941, there can be no question that the rule carried a no penalty provision. Gaskill v. Roth, 8 Cir., 151 F.2d 366.

Union and management alike, who negotiated the contracts, worked under them and had the prerogative and duty of interpreting them, indicate by their actions no right to additional compensation under the express terms of the contracts.

The question here is not whether it is reasonable, or even desirable, to pay for a full additional day for a few seconds' work for which the employee has already been paid once. The issue is not whether such a burden should be imposed by legislative action, or by a board which may conceive it has some duty to police labor agreements by imposing penalties not provided therein.

As late as 1939, lists of equipment which must be kept in cabooses (road, work, and many yard trains have cabooses) provided that at least four air hose, twelve air hose gaskets and appropriate wrenches must be kept in cabooses at all times. These lists of equipment were posted in all cabooses from 1939 through 1944, and trainmen were required to use the equipment as needed, to which requirement neither individual trainmen nor their union representatives protested.

■ The interpretation of Article 11(a), as contended by plaintiffs, requires the insertion of the words "in addition to their regular pay" or equivalent words.

In short, the rewriting of the contract. A court cannot rewrite a contract, City of Philadelphia v. Lieberman, 3 Cir., 112 F. 2d 424; Pure Oil Co. v. Petrolite Corporation, 5 Cir., 158 F.2d 503, nor create new terms or change the terms made by the parties to a contract, Hagarty v. William Akers, Jr., Co., 342 Pa. 236, 20 A.2d 317; Central-Penn Nat. Bank. v. Firestone Tire & Rubber Co., 154 Pa.Super. 70, 35 A.2d 794, nor read into a contract something that is not there expressly or by necessary implication, Cornman v. Graeber Stringing & Wiring Mach. Co., D.C.Pa.1946, 69 F. Supp. 550, affirmed 3 Cir., 160 F.2d 738; Severance v. Heyl & Patterson, Inc., 308 Pa. 101, 162 A. 171; Sentry Safety Control Corporation v. Jaybee Amusement Co., 111 Pa.Super. 318, 169 A. 419, nor assume that its language was chosen carelessly, Moore v. Stevens Coal Co., 315 Pa. 564, 173 A. 661.

From an examination of various provisions of the 1928 contract, it is patent that, irrespective of the meanings of the words "points," "available," and "required," no such penalty was intended or provided. The contract has many articles that govern payments of additional compensation under a great variety of circumstances. Articles 3, 8 and 24 provide a comprehensive schedule for determining and paying for overtime work in passenger, road and yard service; Articles 4 and 9 set up monthly wage guarantees for regularly assigned passenger, freight, wreck, work and construction train service employees; Articles 4, 11(b), 22 and 48(b) prescribe additional pay with an assured minimum for extra service within the same class of service or for working in a different class of service (for example, Article 11(b) requires that if a trainman fires or takes charge of an engine, he will be paid a minimum of three hours at his regular rates plus what he would have earned in his regular service; Article 22(e) provides that a road freight trainman who is required to switch over 20 minutes in getting his train ready for departure will be paid pro rata rates with a minimum of one hour plus his regular road rate); Articles 7, 8(c), 9(b), 11(a), 25 and 30 require that where a trainman works in more than one type of service during his tour of duty, he will be paid for the entire period at the highest rate applicable to any class of service performed.

The interpretation given to "points" and "available" by plaintiffs' experts reduces the phrase "at points where car inspectors or air inspectors are available" to empty, superfluous words. At the trial defendant admitted that at all material times an air inspector was on duty at at least one place in each general yard around the clock. Since the general yards abut, under the experts' testimony, car inspectors were available throughout the length of defendant's road at all times. By their construction the phrase is hollow, the words erased and the article becomes simply "trainmen will not be required to couple air hose."

Not only does such a construction erroneously presuppose that the parties to the contract were oblivious to the external actualities, but it is contrary to a cardinal principle of construction of contracts which was expressed in Basler v. Warren, 10 Cir., 159 F.2d 41, 43, as follows:

"Courts are not warranted in reading out of a contract words or phrases placed there by the contracting parties unless they cannot be rationally fitted into the scheme of the agreement between the parties."

That principle was followed in Pure Oil Co. v. Petrolite Corporation, 5 Cir., 158 F.2d 503, supra; Norwich Union Indemnity Co. v. H. Kobacker & Sons Co., 6 Cir., 31 F.2d 411, 87 A.L.R. 1069; Morris v. American Liability & Surety Co., 322 Pa. 91, 185 A. 201; Nick v. Craig, 301 Pa. 50, 151 A. 573.

Long before there were carmen on the railroad, trainmen coupled all the air hose. Carmen were later put on to assist trainmen in coupling air hose to get the trains through the yards. Under the air hose rule in the 1928 Contract, coupling air hose was the work of trainmen, trainmen doing that work every day on the defendant's railroad. When a trainman coupled hose he was working in his own craft, and the air hose rule only relieved him of doing some of his own work. There is much work on a railroad that it not exclusive to any one craft, such as carmen and trainmen coup-

ling air hose, engineers and firemen calling signals, clerks and telegraphers performing clerical work interchangeably, conductors and trainmen on passenger trains performing certain duties equally, and the like.

If coupling air hose was not the work of trainmen as a craft, the defendant could not require them to couple air hose under any circumstances, regardless of compensation, because carmen being jealous of their craft or their rights to do certain work would not permit it. Not only the carmen but the operating unions are jealous to protect their contracts, particularly where there are competing unions such as exist between the trainmen and carmen.

That coupling air hose on defendant road has been the duty of the trainmen's craft since before the turn of the century and remained the duty of that craft under the 1928 Contract is irrefutably demonstrated by (1) practice, (2) admissions of plaintiffs, (3) the interpretation by the parties to the agreement, (4) the agreements themselves, and (5) all reasonable inferences from the facts.

Although the bargaining representatives were constantly alert to police their contracts and to obtain all the money possible for their men, and the trainmen were not timid about filing slips asking extra pay, the first time slip wherein a claim was processed requesting additional compensation for coupling air hose was filed on March 16, 1941, twenty-six years after the rule first appeared in the contract. During those years the unions' representatives told the men it was useless to file such time slips because they would not be paid since it was part of a trainman's duty to couple air hose.

For interpretation of the contract plaintiffs rely on the testimony of experts, who know nothing about the physical yard setup of defendant railroad, have no information as to what the parties who negotiated the contract intended it to mean and do not believe that such information would be at all persuasive.

In the face of these affirmative contractual provisions, it would be naive to suggest that the unions would not or could not have insisted that explicit language be included in the contract providing for additional pay to trainmen for violation of the air hose rule, if such penalty payment was intended; and it would be equally ingenuous to urge that the railroad would have acceded to such an understanding (particularly to eight hours additional pay for less than a minute's work) without expressing the understanding in the contract.

Language in a contract will not be construed as a forfeiture (or penalty) unless no other construction is reasonably possible. Kasishke v. Baker, 10 Cir., 146 F.2d 113; Ferguson v. Union Nat. Bank, 4 Cir., 126 F.2d 753; Hild v. Dunn, 1933, 310 Pa. 289, 165 A. 228; Baldwin v. American Motor Sales Co., 1932, 309 Pa. 275, 163 A. 507.

Reformation of a contract can ordinarily be had only where the contract as executed fails to express intention of parties as a result of accident, inadvertence, mistake, fraud, or inequitable conduct, or where there has been both fraud and mistake, as a unilateral mistake induced by fraud. Mistake must be mutual or an unilateral mistake induced by fraud. There must have been in effect an agreement which the written instrument evidences, and the mistake must have been in the drafting of the instrument, not in the making of the contract. Rock-Ola Mfg. Corporation et al. v. Filben Mfg. Co. et al., supra.

The facts in this case do not fall within the above rule and there was definitely no mistake in the drafting of either the 1928 or 1936 Contract.

I believe the representatives of labor who negotiated and executed the 1928 and 1936 Contracts with the defendant knew that no additional compensation was to be paid trainmen for coupling air hose. Should the Court utterly ignore what the parties who wrote the contract intended it to mean, to completely discount the practical construction of the rule by the parties to the contract over a period of twenty-six years and to make a new contract by reading into it a meaning never intended by the parties?

■ I must answer the question in the negative and, therefore, under the express provisions of the 1928 and 1936 Contracts none of the plaintiffs are entitled to recover.

Question II—If the contracts are construed by their express terms to not entitle the plaintiffs to recover, did a nationwide custom and practice exist that the parties recognized and intended to be a part of said contracts, which entitles the plaintiffs to an additional day's compensation for coupling air hose?

The question is whether there is such clear and adequate evidence of an unexpressed understanding and agreement as to vary the terms of the written contracts.

The basic day rule, which it is contended applies to all of said plaintiffs, is to be found in Article 8(a) and Article 44 of the 1928 Contract and Article 9(a) and 44 of the 1936 Contract. There is no relevant difference or distinction between the basic day rules as they appear in the two contracts respectively. It will be observed that the two contracts (except for the different designation of employees) have identical articles.

The basic day rule first appeared in the contract executed with the defendant in 1900, wherein it was set forth that twelve (12) hours or less constituted a basic day, which was subsequently reduced to ten (10) hours and later eight (8) hours.

■ The eight (8) hour basic day permanently applied an eight hour standard for work and wages. It did not fix the amount of the task to be done during those hours, thus leaving that to the will of the parties. It did not take away from the employer and employees their private right to contract on the subject of a scale of wages. Wilson v. New, 243 U.S. 332, 356, 357, 37 S.Ct. 298, 61 L.Ed. 755, 777, 778, L.R.A.1917E, 938, Ann.Cas.1918A, 1024.

The basic day rule is derived from the craft system which is characteristic of railroad work and the collective bargaining agreements made by such organizations. It gives recognition to the fact that the employee required to work outside his specialized field is prejudiced thereby in a manner wholly independent of any actual pecuniary loss suffered. The principle is logically deducible from terms commonly found in collective bargaining agreements.

■ The court cannot consider the reasonableness or equity of this principle since the parties must be permitted to make their own contracts. Their intentions must be carried out even if it results in the recovery of an amount as liquidated damages on proof that the contract has been violated, and without proof of the damages actually sustained. Insley v. State Mutual Life Assurance Co., 334 Pa. 368, 375, 5 A.2d 544; United States v. Bethlehem Steel Co., 205 U.S. 105, 119, 27 S.Ct. 450, 51 L.Ed. 731; Williston on Contracts, Section 788, 793.

The plaintiffs contend:

1. That for many years prior to 1928 and continuing to the present time there has been and there is a nationwide usage or custom to the effect that even without any penalty clause or arbitrary in the contract, plaintiffs are entitled to pay at the rate of an additional day if they worked outside of their craft, or if they worked outside of their regularly assigned duties, or, in other words, in either of those two situations; unless, of course, the contract provides some other arbitrary or compensation.

2. That there is nothing in either of the contracts inconsistent to the slightest degree with the additional day usage or custom.

3. That proof of the custom or usage which exsisted even before 1928 was admissible under the principle that where there is nothing to the contrary in the contract the parties may be considered as leaving to implication incidents which custom or usage of trade might be expected to annex. Hostetter v. Park, 137 U.S. 30, 11 S.Ct. 1, 34 L.Ed. 568; Moore v. United States, 196 U.S. 157, 166, 25 S.Ct. 202, 49 L.Ed. 428; Shipley et al. v. Pittsburgh & L. E. R. Co., D.C., 68 F.Supp. 395, 403; Dixon et al. v. Chase National Bank of N. Y., 2 Cir., 144 F.2d 759, 762.

The basic position is that the custom and usage of applying an extra day's pay penal-

ty had been so universally recognized in the industry, and had become so firmly fixed in the minds of the parties to this contract when it was made in 1928, that it must be presumed that they intended it to become a part of their agreement. That position is most succinctly stated that even if the contracts had been completely silent on the measure of compensation, nevertheless, because they were written at the time the additional day rule and usage were already firmly established in the industry, and such rule and usage were not excepted, they would be entitled to the additional day or, as they sometimes term it, the basic day. The additional day principle or custom was established prior to 1928.

In essence, the additional day principle, as regards out of craft work, is premised on the proposition that an employee working in two separate crafts, by that process, has rights flowing from the two contracts involved.

The defendant contends:

1. That the plaintiffs who would be the beneficiaries under such a principle, by their consistent and long standing failure to make a claim for air hose coupling until March 16, 1941, have pursued a course of conduct which directly contradicts the contention that the additional day penalty is the proper measure of damages in the instant case. That affirmative course of action by plaintiffs, in direct opposition to their interests, assuming the applicability of the "one violation, one day's pay" principle, refutes the contention that such a principle is implied in railroad labor agreements.

2. That all the representatives who negotiated the contracts and who testified unequivocally stated that there was no provision in the contract entitling trainmen to extra pay for coupling hose.

■ The railroad world for which the Railway Labor Act was designed is like a state within a state. Its population is over three million, if inclusion is given to the families of workers, has its own customs and its own vocabulary, and lives according to the rules of its own making.

Every stage in the evolution of this railroad labor code was progressively infused with the purpose of securing self-adjustment between the organized railroads and railroad unions and, to that end, of establishing facilities for such self-adjustment by the railroad community of its own industrial controversies.

In railway labor contracts there is a great deal of background and practice that is presupposed. When in any particular situation a union makes its first contract, which incidentally in the case of most of the big railroads was a long time ago, that contract is initially made in the context of operating practices and customs, and a great part thereof never gets spelled out. Then as contracts develop, specific provisions may be inserted to take care of particular conditions. Men on one road will find that the men on another road have a certain rule that they like better, and so they will start negotiations to have it copied into their contract, and so on.

■ In an action in federal court involving the construction of a railroad collective bargaining agreement, what must be proved as to a custom or usage modifying the contract is governed by the law of the state where the contract was executed. Sickelco v. Union Pacific R. Co., 9 Cir., 111 F.2d 746.

■ To establish a custom it is not enough to prove the act is frequently done; it must be both alleged and proved to be certain, general, uniform and recognized, and so notorious as to be probably known to all parties to be controlled by it. Where it is so alleged and proved, it is a fair presumption that the parties, on entering into their engagement, do it with reference to the custom, and agree that their rights and responsibilities shall be determined by it. A practice to arise to the dignity of a custom so as to enter into and form a part of a contract must possess those elements of certainty, generality, fixedness, and uniformity, as are recognized by the law as essential to constitute a custom. A loose, variable custom or discretionary practice does not arise to the dignity of a custom so as to control the rights of

the parties to a contract. If the usage leaves some material element to the right of exercising an option, or discretion, of one of the parties, it does not constitute a custom. Doyle v. Atlantic Refining Co., 357 Pa. 92, 53 A.2d 68; Makransky v. Weston, 304 Pa. 383, 155 A. 741; Tate-Jones & Co., Inc., v. Union Electric Steel Co., 281 Pa. 448, 126 A. 813; Everly v. Shannopin Coal Co., 139 Pa.Super. 165, 11 A.2d 700; Etna Forge & Bolt Co. v. Youngstown Sheet & Tube Co., 3 Cir., 282 F. 786.

■ Custom of parties to disregard a provision of a contract cannot affect their legal rights and obligations under its terms. Goldwyn Distributing Corporation v. Brenneman, 3 Cir., 13 F.2d 105.

■ One who would establish a custom or usage has the burden of proving it by evidence so clear, uncontradictory and distinct as to leave no doubt as to its nature and character. Doyle v. Atlantic Refining Co., supra; Everly v. Shannopin Coal Co., supra.

■ The existence of a usage or custom can only be proved by numerous instances of actual practice and not by the opinion of a witness. Aurand v. Universal Carloading and Distributing Co., 131 Pa. Super. 502, 200 A. 285; Wilson Distilling Co. v. Foust Distilling Co., D.C., 60 F. Supp. 373.

■ Parties to a contract are presumed to know trade usage generally adopted by those engaged in the business to which the contract relates. They are presumed to have contracted with reference to, and to have knowledge of, all lawful usages of that trade. Elgin, J. & E. Ry. Co. v. Burley, 327 U.S. 661, 664, 66 S.Ct. 721, 90 L.Ed. 928; Order of Railway Conductors of America v. Pitney, 326 U.S. 561, 567, 66 S.Ct. 322, 90 L.Ed. 318.

■ Any custom which exists must yield to express agreement. Ripley v. Findlay Galleries, Inc., 7 Cir., 155 F.2d 955, certiorari denied 329 U.S. 775, 67 S.Ct. 194, 91 L.Ed. 666.

■ Evidence of usage or custom is admissible to show the intent of parties as an incident to a written contract, upon which the writing is silent. City of Philadelphia v. Lieberman et al., 3 Cir., 112 F. 2d 424, certiorari denied 311 U.S. 679, 61 S.Ct. 48, 85 L.Ed. 438.

■ A custom which is general and established raises a presumption of its reasonableness, and the burden of proof is on the party asserting its unreasonableness. 25 C.J.S., Customs and Usages, § 13, page 93.

■ The courts are loath to hold parties to unexpressed obligations, unless it clearly appears that the matter was so plainly within their intention that it went, according to a current expression, "without saying." Wilson Distilling Co. v. Foust Distilling Co., supra; In re Bowling Green Milling Co., Inc., 6 Cir., 132 F.2d 279; Electrical Research Products, Inc., v. Gross, 9 Cir., 120 F.2d 301.

Was the custom and usage so well established, general and uniform, that the parties are presumed to act and contract with reference to it? Shipley et al. v. Pittsburgh and Lake Erie R. Co., supra. Was the custom and usage so definite, uniform, well known and generally acquiesced in that the parties presumably acted in reference to it? Was the custom and usage such that the parties presumably agreed that their rights were to be determined by it?

■ I have discussed the legal theory by which terms not expressed in the writing may become a part of a contract by implication. The very essence of the rule is that the meeting of minds must be so clear and unequivocal, and the understanding so complete, that it would be an unnecessary waste of time and effort to express the agreement in writing.

There was no change either in the terms of the 1928 Contract, as compared with that of 1915, or in any of the relevant surrounding circumstances which would warrant any different interpretation of the two documents.

The 1928 Contract was negotiated, containing Article 11(c) relative to coupling hose. No provision was made for the allowance of additional compensation. Despite that fact, it is now asserted that a

right to an additional day's pay accrued when the air hose rule was violated. That result, it is said, follows as a necessary implication from the basic day rule. Such implication can only be predicated on a showing that if the subject had been brought up for discussion, the parties to the contract involved would have immediately agreed to an express provision identical to that which would be implied.

The defendant states no sound basis exists to find such agreement existed in 1928 in the face of facts which demonstrate an utter lack of agreement. Management was consistently and successfully denying the existence and propriety of the "one violation, one day's pay" principle during that very period, and equally significant is the fact that the labor organizations themselves disclaimed any right to an additional day's pay in proceedings involving air hose rules until March 16, 1941. The factual situation in 1928 would more nearly support the proposition that management and labor agreed that violations of an air hose rule did not entail liability for an additional day's pay, which became an implied term of the 1928 agreement.

■ Since a contract is a consensual transaction, the rights and duties created by it are limited by the necessity of finding that prerequisite consent and agreement by the parties. In this respect the proceedings are highly relevant and significant as they disclose the interpretations which the parties placed upon their agreements and thus they bear directly upon the critical issue in the case.

■ The courts have held that the representative of a particular craft cannot negotiate with management and make agreements which affect the rules, rates of pay or working conditions of any other craft. General Committee of Adjustment of Brotherhood of Locomotive Engineers for Missouri-Kansas-Texas R. R. v. Missouri-K.-T. R. Co., 5 Cir., 132 F.2d 91, reversed on different grounds 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76.

The plaintiffs lay great stress on the fact that one of the highest executive officers of the defendant admitted that generally there was a usage and custom existing which recognized the payment of an additional day where the employee engaged in work outside his craft or outside of his regular assigned duties.

■ If the testimony was without limitation in this respect, the problem which exists might be more simplified. This would be true since admissions by an officer of a company who stands in a position of authority are competent and binding on the company for whom he speaks. Guardian Trust Co. v. Meyer, 8 Cir., 19 F.2d 186.

However, the testimony was qualified in that it was consistently stated the rule did not apply to air hose coupling since this work was not outside the craft of trainmen, and it was part of their regular assigned duties.

■ Even if the additional day custom had been departed from occasionally, it is well established that the Court will follow a custom generally recognized in the trade even though it has not been observed in every individual transaction. United States v. Stanolind Crude Oil Purchasing Co., 10 Cir., 113 F.2d 194, at page 200, and cases there cited.

I have not considered the reasonableness of the extra or additional day's pay for a few minutes' work since if the custom and usage should be read into the contracts, said factor is immaterial.

■ I believe that a custom or usage did exist among railroads generally, and more particularly the defendant's railroad, for some time prior to 1928 and continuing to the present date, that when an employee did work outside of his craft or his regular assigned duties, he was entitled to an extra or an additional day's pay if the contract under which he worked carried no provision as to the arbitrary or compensation to be paid, unless the intent and understanding of the parties was that no compensation would be paid.

Did the parties, therefore, have a meeting of the minds when the 1928 and 1936 Contracts were negotiated and executed whereby the usage or custom which existed was to be incorporated and made a part of the written agreements?

In the evaluation of the facts and the drawing of inferences most favorable to the plaintiffs, I am forced to the conclusion that it was not intended that such usage or custom would apply to the contracts for the following reasons:

(a) Trainmen while coupling air hose were pursuing and carrying out their regular assigned duties.

(b) Trainmen while coupling air hose were not engaged in duties outside their craft.

(c) The coupling of air hose was not exclusive to the car inspector's craft.

(d) The coupling of air hose was a duty of both trainmen and car inspectors and falls within the craft of trainmen and car inspectors.

(e) The trainmen recognized the coupling of air hose as their duties and as being within their craft over a period of years, and their bargaining representatives or the employees made no claim for so doing until March 16, 1941.

(f) Although the National Railroad Adjustment Board, First Division, sustained a claim under Award 8258, all facts which have been presented in this action were not developed before said Agency.

(g) At the time of the negotiation and execution of the 1928 and 1936 Contracts it was specifically understood that said custom or usage would not apply since no discussion or demand was made in behalf of the employees that an additional day would be paid for coupling air hose.

In addition to the foregoing, when the 1928 and 1936 Contracts were revised and renegotiated which resulted in the execution of the contract effective December 1, 1944, trainmen who now couple air hose do not in all instances receive an additional day's pay. In some instances an additional day is to be paid, in others an arbitrary of one hour at pro rata rate is to be paid, but in others no compensation is allowed.

It appears to me that if the custom or usage which the plaintiffs desire to have implied in the 1928 and 1936 Contracts was intended to be a part thereof, the representatives of the great Brotherhood of Railroad Trainmen would not have agreed to provisions in the new contract which denied trainmen compensation or payment for less than an additional day's pay.

It must also be considered that car or air inspectors engaged in the coupling of air hose were not governed by either the 1928 or 1936 Contracts.

I have heretofore made reference to the bargaining agreements under which the carmen worked with the defendant. There is no provision in any of the carmen's contracts which spells out or states that coupling of air hose is the exclusive work of carmen; in fact, it is not stated to be the work of carmen under any circumstances. However, for many years prior to the period involved in this proceeding, and prior to the execution of the contracts involved in this suit, car or air inspectors have engaged in the coupling of air hose.

The carmen or their bargaining representatives have never complained or protested against trainmen coupling air hose (although protest was made against a yardmaster making such coupling), which, I believe, would have been done if they thought that such actions of trainmen intruded on their duties or craft.

On May 1, 1948, which was subsequent to the taking of testimony in this case, the action having been filed December 1, 1944, the carmen through their collective bargaining representatives negotiated and executed a new contract with the defendant.

With the position of the trainmen then known among the employees generally on the defendant railroad, no provision exists in the contract of the carmen which states the coupling of air hose is or is not the work of carmen.

I believe this conclusively establishes that the coupling of air hose on the defendant railroad by custom is considered the work of trainmen and carmen, that under certain circumstances it is part of the regular assigned duties of each class, and that said work is common to the craft of trainmen and carmen.

Many of the claims of the plaintiffs in this action are based on the coupling of air hose which the 1944 Contract specifically provides no compensation will be paid or payments will be made for less than a day.

It is unreasonable and not conceivable to believe that the bargaining representatives of the trainmen would cast aside and agree that a right which existed would be denied those men who do so much to preserve our economic security through their faithful application to the part which they play in making the railroad industry work.

This case is in no sense a labor controversy and the Brotherhood of Railroad Trainmen or the Order of Railway Conductors are not parties, or have they asked leave to intervene. These organizations are at all times alert to the welfare of the men whom they represent. If the usage or custom which the plaintiffs are presenting was so deeply embedded in labor relations, I think both organizations would have been the first to step forward and state that under the two contracts on the defendant railroad the custom and usage should be considered as a part thereof.

The Railway Labor Executives' Association has been permitted to present its briefs "Amicus Curiæ" and the Court has with great interest and care considered the same with the utmost thoroughness. It is important to note that the presentment made is based on the assumption that a violation of the 1928 and 1936 Contracts has been established or that liability exists thereunder.

In fact, they state "the question of the 1928 and 1936 Contracts with the defendant are matters peculiar to the circumstances in this case, and we have no particular concern with the bargaining agreements or with any interpretation which may be placed thereon by the Court."

The whole of their presentment relates to the principle "where limits are provided by agreement as to the type of work which may properly be assigned to employees; where the agreement further provides that eight hours or less shall constitute a day's work, then, if an employee is required to perform work outside the limits fixed by the agreement, such employee becomes entitled to a day's pay for the time worked within the permissible limits of his employment, and a day's pay for the time worked outside those limits, provided that there is no special provision in the agreement limiting his claim to a lesser amount."

Generally, I believe, this principle is sound and recognized between representatives of railroad labor and the railroad industry. It is subject to the exception, in my judgment, that if it is the understanding of the parties to the working agreement that no compensation is to be paid, then it should not apply.

For reasons which have been previously stated, I do not believe it was intended by the parties that the custom or usage to pay an additional day's compensation was to apply where trainmen coupled air hose when car inspectors were available.

Question III—Does an award of the National Railway Adjustment Board, which sustained claims for coupling air hose under similar circumstances as that involved in this action, where none of the plaintiffs were parties thereto, require the Court to apply said award in disposing of the claims involved in the case at bar?—

In order that the legal effect of the award in question can be properly considered, it is necessary to make reference generally to its background.

The first request of defendant by trainmen for additional compensation for coupling air hose processed to hearing was on March 16, 1941, when Hemphill and Wagner, two yard helpers on a crew consisting of three trainmen, filed a time slip asking an additional day's pay for coupling air hose in Gorilla Park yard, which is one of the lesser yards in East Youngstown general yard. Their yard foreman did not make a similar claim. Defendant declined the claim, and it was processed by the BRT general grievance committee through the prescribed channels up to defendant's general manager.

The BRT general grievance committee First Division being designated to handle appealed the matter to the First Division, National Railroad Adjustment Board, the disputes involving train and yard service employees, which category includes trainmen. The First Division consists of ten members, five selected and paid by the carriers and five selected and paid by the labor organization. 45 U.S.C.A. § 153. The labor organizations represented on the First Division are and were Brotherhood of

Locomotive Engineers, Brotherhood of Locomotive Firemen and Enginemen, BRT, ORC and Switchmen's Union of North America.

The BRT general grievance committee requested management to join in submitting the case to the First Division, which was done since the BRT could take it to the Board ex parte and the policy of defendant had been, where at all possible, to join in such submissions. The organization and management could not agree on a statement of facts and their positions were at variance, so that actually the submission was joint only in the sense that the positions of the parties were forwarded to the Board in one envelope.

In submitting the Hemphill-Wagner claim to the First Division, the BRT made reference only to Article 11(a), (b), and (c) of the 1928 Contract and made no mention of Article 44, the basic day rule, or any other pay provision. The position of the carrier was that Paragraphs (a), (b), (c) and (d) of Article 11 had no application to the air hose rule, and that there was no rule or practice to support a claim for an additional day for coupling air hose.

None of the parties was represented by legal counsel, no witnesses were called, no testimony was given under oath, no briefs were filed, there was no interrogation by any of the Board members, no stenographic notes were taken and the parties were limited to the positions set forth in their submissions.

The carrier and labor members of the Division having deadlocked, a Referee was appointed by the Mediation Board, as provided in the Act, to serve as an eleventh member and break the impasse. Under the Railway Labor Act, the ten members of the Division are to first attempt to agree upon and select a neutral referee before certifying the matter to the Mediation Board to have it appoint such a referee, 45 U.S.C.A. § 153, subd. 1(*l*), but the members of the First Division could not agree upon a referee.

The parties were not given any notice or opportunity to be heard before the referee. The referee held an informal hearing at which one carrier member and one brotherhood member of the Division each presented his respective side of the case to the referee, the referee necessarily taking the facts as the records of the division showed them to be and thereafter made his decision.

On July 19, 1943, the claim was sustained and the defendant ordered to pay Hemphill and Wagner an additional day's pay at yard helper's rate on or before August 19, 1943.

The details of said claim and award are set forth in detail:

"Award No. 8258
"Docket No. 14903

"First Division

"National Railroad Adjustment Board
"39 S. LaSalle St., Chicago 3, Illinois

"The First Division consisted of the regular members and in addition Referee Robt. G. Simmons when award was rendered.

"Parties To Dispute:

"Brotherhood of Railroad Trainmen

"The Pittsburgh and Lake Erie Railroad Company

"Statement of Claim: Claim of Yard Helpers V. D. Hemphill and E. R. Wagner for one day's pay at yard helper's rate account required to couple air hose in the East Youngstown Yard on March 16, 1941.

"Employes' Statement of Facts: Yard Helpers Hemphill and Wagner were assigned as helpers on Job 170 in the East Youngstown yard. In making a movement from the so-called Gorilla Park—part of the East Youngstown Yard—they were required to couple the air hose and test the air, which is not a part of yard helpers assignment of work at any point on the Pittsburgh and Lake Erie Railroad.

"On our property car and air inspectors couple and test the air, and were on duty in that portion of the yard at the time Yard Helpers Hemphill and Wagner were required to perform their work.

"Article 11 reads:

"'Article 11—Outside Duties

"'(a) Trainmen required to tend switches, watch crossings or do any other work outside of their regularly assigned duties will be paid their regular wages, except when filling positions that pay a higher

rate they shall receive the higher rate for the full day.

" '(b) Trainmen will not be used to fire engines on outlawed trains tied up by law or for other reasons, or to take charge of engines when engine service employes are available. When used, they will be paid a minimum of three hours at their regular rates per hour, plus what they would have earned in their regular service.

" '(c) At points where car inspectors or air inspectors are available, trainmen will not be required to couple air or steam hose.

" '(d) Trainmen will not be required to chain or unchain cars at points where car inspectors are available.'

"Carrier's Statement of Facts: Yard Helpers Hemphill and Wagner on March 16, 1941, were assigned to East Youngstown yard screw No. 170, on duty at 8:00 A. M., in charge of Yard Foreman Bonam. Shortly after 8:00 A. M. Yard Foreman Bonam and crew moved a train of 21 cars from Gorilla Park to Ohio Works yard for delivery to the Youngstown Sheet & Tube Company, Brier Hill Works, and when picking up the 21 cars from tracks 6 and 7 at Gorilla Park. it was necessary to make air hose couplings on five cars on track No. 7, at which point there are no air men or inspectors assigned on first trick.

"Yard Helpers Hemphill and Wagner claimed eight (8) hours in addition to their regular time on the date in question account of coupling air hose which was declined by the Carrier.

"Position of Employes: It is the position of the committee, representing the Brotherhood of Railroad Trainmen, that Article 11 has worked satisfactory for many years during all of which time yardmen have not been required to couple air hose at any point where car or air men were employed.

"While we do not advocate it, yardmen have refused to couple air hose or test air, and have not been disciplined.

"A number of new yard masters and other officials occasionally take the position that air or car inspectors are not available if they are working on other cars even through the trans or cars are on adjacent tracks.

"The word 'available' was discussed at length when it was written into our agreement and General Manager Minnick stated that car or air inspectors would be considered available if they were on duty in the vicinity or yard.

"Yard or road crews are not furnished blue flags or blue lights or private locks as are car and air men on the Pittsburgh & Lake Erie Railroad, therefore, we hold that Article 11 adequately protects our yardmen at any and all points where car and air men are employed.

"Further, it is our position that paragraphs (a) and (b) provide for the only service outside their regular assigned duties that they can be required to perform. Paragraph (c) tells us that we will not be required to perform such service as coupling air hose or chain cars, such work being outside our usual duties and definitely belonging to another group of employes.

"We feel the Board should sustain this claim and thereby preserve yard work for yardmen; car and air inspectors' work for men hired and trained for that character of work whose contract and agreements cover and purport to allot that work to that class of men.

"Oral presentation is desired.

"Position of Carrier: There are no rules contained in the agreement between this Carrier and the Brotherhood of Railroad Trainmen, which provides that if yardmen are required to couple air or steam hose they will be compensated double time as claimed by the employes.

"When this case was discussed with the Committee, they contended that Article 11, Paragraphs (a) and (c) of the agreement covering Trainmen was violated account of yardmen being required to perform car inspector's work.

"Article 11 reads:

" 'Article 11—Outside Duties

" '(a) Trainmen required to tend switches, watch crossings or do any other work outside of their regularly assigned duties will be paid their regular wages, except when filling positions that pay a higher rate they shall receive the higher rate for the full day.

756

" '(ℓ) Trainmen will not be used to fire engines on outlawed trains tied up by law or for other reasons, or to take charge of engines when engine service employes are available. Where used, they will be paid a minimum of three hours at their regular rates per hour, plus what they would have earned in their regular service.

" 'Coupling Air and Chaining Cars

" '(c) At points where car inspectors or air inspectors are available, trainmen will not be required to couple air or steam hose.

" '(d) Trainmen will not be required to chain or unchain cars at points where car inspectors are available.'

"It will be noted that Paragraphs (a), (b) and (d) of Article 11 are in no manner applicable to the matter in question.

"Paragraph (c) of Article 11 provides that at points where car inspectors or air inspectors are available, trainmen will not be required to couple air hose.

"There is no assignment of car inspectors at Gorilla Park, except one assignment going on duty at 8:00 P. M., and a check of our records indicate that there is not sufficient work to assign car inspectors at this point except as stated in foregoing.

"However, when this case was discussed with local officers, the Local Committee were advised by letter that arrangements had been made to take care of the necessary air hose coupling work at Gorilla Park in the future.

"Letter addressed to Local Chairman Haddix by General Yard Master McMahon, dated April 18, 1941, was as follows:

" 'In reference to the conference held with your Committee at this office on April 9, 1941, at which time the time claims of V. D. Hemphill and E. R. Wagner, as of March 16, 1941, were discussed, your Committee contending that these men are entitled to an additional day's pay because they made some air hose couplings in Gorilla Park Yard, East Youngstown.

" 'There is nothing in the Agreement that provides for this payment under the circumstances. Therefore, there appears to be no basis for your claim and same is denied. However, I have made arrangements to take care of the necessary air hose coupling work in Gorilla Park. in the future.'

"Under the circumstances, it is apparent that this claim is without justification, as the work performed by these men cannot in any way be considered as a hardship, nor is there any rule or practice to support claim for an additional day's pay for coupling air hose. Therefore, we respectfully request your Board to deny the claim.

"Opportunity for oral presentation desired.

"Findings: The First Division of the Adjustment Board, upon the whole record and all the evidence, finds that:

"The carrier or carriers and the employe or employes involved in this dispute are respectively carrier and employe within the meaning of the Railway Labor Act, as approved June 21, 1934.

"This Division of the Adjustment Board has jurisdiction over the dispute involved herein.

"The parties to said dispute were given due notice of hearing thereon.

"This claim appears to turn upon the construction to be given Article 11(c). This Division without the aid of a referee has held that the word 'points' when used without qualification means the same as station, yard or terminal and embraces all territory within such limits. (Award 5524.)

"It has also construed similar rules wherein the limiting words 'are available' are used. See Awards 1905-7309. Under the authority of those awards, made without the aid of a referee, this claim must be sustained.

"Award

"Claim sustained.

"By Order of First Division
"National Railroad Adjustment Board

"Attest: (Sgd.) T. S. McFarland
Secretary

"Dated at Chicago, Illinois, this 19th day of July, 1943."

In sustaining the claim, the Referee did not discuss or make reference in detail to the facts upon which the award was premised. It seems to be the practice of the

Board that the sustaining of a claim means the position of the employees has been found correct. The Board through a Referee found the following facts:

(a) That during the period Article 11 has appeared in the bargaining agreements, trainmen have not been required to couple air hose at any point where car or air men are employed.

(b) That car or air inspectors are available if they are on duty in the vicinity or yard.

(c) That trainmen are not furnished the same protection in the coupling of air hose as car inspectors.

(d) That the coupling of air hose is outside the duties of trainmen and not within their craft.

The plaintiffs contend that Award No. 8258 of the First Division, National Railroad Adjustment Board, which involved the claim of Messrs. Hemphill and Wagner, trainmen on the defendant railroad, for coupling air hose at points where car inspectors were available, is authority for finding that the Board considered air hose coupling by trainmen at points where car inspectors were available outside the usual duties of the trainmen and belonging to another class or craft of employees on the defendant railroad.

The defendant contends that Award No. 8258 was a misinterpretation of the air hose rule in the 1928 Contract which was decided by a referee who (1) did not have before him the history of the rule, the facts as to the unique yard arrangement of defendant road or the common understanding of the parties who negotiated and executed the agreement that there was no penalty attached to the rule; (2) made findings and an award with such succinctness that one cannot determine on what part of the contract, if any, the money allowance was granted; (3) relied on prior awards involving other railroads under different physical and contractual circumstances which awards themselves may be searched in vain for a rationale and are of no precedent value; (4) completely ignored other awards which recognized and applied reasonable and salutary principles; and (5) departed from the deep-rooted judicial standards of fairness and equity in granting eight hours additional pay for less than one minute's work.

Under the circumstances what legal effect should be given Award 8258 in the adjudication of the issues now before the Court?

The National Railway Adjustment Board is acquainted with established procedure, customs and usages in the railway labor world. It is a specialized agency selected to adjust controversies. Its expertise is adapted not only to interpreting a collective bargaining agreement, but also to ascertaining the scope of the collective agent's authority beyond what the Act itself confers, in view of the extent to which this also may be affected by custom and usage. The factual questions are intricate and technical. An agency especially competent and specifically designated to deal with matters arising thereunder has been created by Congress. Elgin, J. & E. R. Co. v. Burley, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928; Order of Ry. Conductors of America v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318.

Even where claimants are successful before the National Railroad Adjustment Board, where they bring suit in federal court to enforce an award, the proceedings are de novo. Dahlberg v. Pittsburgh & L. E. R. R. Co., 3 Cir., 138 F.2d 121; Washington Terminal Co. v. Boswell, supra; Order of Sleeping Car Conductors v. Pullman, D.C.Wis., 47 F.Supp. 599; Order of Railroad Telegraphers et al. v. New Orleans T. & M. Ry. Co., D.C., 61 F. Supp. 869.

While ordinarily an award must be given weight comparable to expert testimony, Elgin, J. & E. R. Co. v. Burley, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928; Virginian Ry. Co. v. System Federation No. 40, 4 Cir., 131 F.2d 840; Washington Terminal Co. v. Boswell, supra [124 F.2d 241], this principle is based on the fact that the regular constituted members of the Board "know the language, functions and purposes of railroads and their collective agreements. Their judgment is informed by experience in negotiating and administering these contracts." Washington Ter-

minal Co. v. Boswell, supra. As was said in Virginian Ry. Co. v. System Federation No. 40, supra, This Board is composed of specialists who may be presumed to have peculiar skill and knowledge in the field of collective agreements between railroads and their employees.

The referee who decided Award 8258 has been for many years a Justice of the Supreme Court of Nebraska, but he was without any great experience in dealing with railway labor contracts. Though he had previously served as a referee on the First Division, none of his prior decisions involved the air hose rule in any contract. In arriving at his decision he did not consider, because he did not have before him, the origin of the air hose rule as it appeared in the 1928 and 1936 Contracts, the singular composition of defendant road as to contiguous abutting general yards each of which was comprised of many smaller yards, or the testimony of the collective bargaining representatives and the defendant that there was nothing in the contract that provided a penalty where the air hose rule was violated.

After reciting in his findings that the jurisdictional requirements had been met, the findings and award are tersely these:

"This claim appears to turn upon the construction to be given Article 11(c). This Division without the aid of a referee has held that the word 'points' when used without qualification means the same as station, yard or terminal and embraces all territory within such limits.

"It has also construed similar rules wherein the limiting words 'are available' are used. Under the authority of those awards, made without the aid of a referee, this claim must be sustained.

"Award

"Claim Sustained."

■ An award of the National Railroad Adjustment Board will be set aside or changed only for error. Order of Railway Conductors of America v. Pitney, supra; Elgin, J. & E. R. Co. v. Burley, supra; Washington Terminal Co. v. Boswell, supra.

■ Courts may properly attach weight to the decision of points of law by an administrative body having special competence to deal with the subject matter. Dobson v. Commissioner, 320 U.S. 489, 502, 64 S.Ct. 239, 88 L.Ed. 248; Southern Pacific Co. v. Joint Council Dining Car Employees, 9 Cir., 165 F.2d 26, 30, certiorari denied 333 U.S. 838, 68 S.Ct. 608.

■ The action of the Railroad Adjustment Board is not merely advisory. The findings have substantial effect even though a money judgment cannot be given finality as to either facts or law. The conclusions reached are of probative value, not merely presumptive in value, having effect fairly comparable to that of expert testimony. Dahlberg v. Pittsburgh & L. E. R. Co. et al., supra; Elgin, J. & E. R. Co. v. Burley, supra.

■ Assuming that it is a principle of the Board that where a contract is silent on the matter and the claimant does not ask less, the claimant is entitled to an extra day's pay for working outside his craft, no more can an administrative agency such as the National Railroad Adjustment Board rewrite a contract by administrative fiat than a court can by judicial construction. Terminal R. Ass'n of St. Louis v. Brotherhood of Railroad Trainmen, 318 U.S. 1, 6, 63 S.Ct. 420, 87 L.Ed. 571, 577.

■ The Railway Labor Act, like the National Labor Relations Act, does not undertake governmental regulation of wages, hours, or working conditions. Instead it seeks to provide a means by which agreement may be reached with respect to them. The national interest expressed by those Acts is not primarily in the working conditions as such. So far as the Act itself is concerned these conditions may be as bad as the employees will tolerate or be made as good as they can bargain for. The Act does not fix and does not authorize anyone to fix generally applicable standards for working conditions. The federal interest that is fostered is to see that disagreement about conditions does not reach the point of interfering with interstate commerce. The Mediation Board and Adjustment Board act to compose differences that threaten continuity of work, not to remove conditions that threaten the health or safety of workers.

■ Even if it be a settled construction of the Board that where a man performs work in another craft, he is entitled to an additional day's pay provided there is no special limitation in the contract, the court cannot follow such construction if it is clearly wrong. Interstate Commerce Commission v. Dunn, 5 Cir., 166 F.2d 116.

Where a collective bargaining agreement is silent as to part of the duties of the employees of the railroad, and in addition thereto carries no provision as to the compensation to be paid to the employees who perform services similar to the services performed by other employees who fall within a different craft, and it appears that for many years the employees whose duties are not specifically set forth traditionally perform a large percentage of the duties which were performed by members of the other craft, an award of the National Railroad Adjustment Board which would require the the payment to said employees for the services performed would amount to a change in the contract and, in my opinion, exceeds the Board's interpretative authority.

■ An award before the National Railroad Adjustment Board which alters, changes or amends a collective bargaining agreement is an usurpation of the power granted the Board under the Railway Labor Act to interpret such agreement. Hunter v. Atchison, T. & S. F. Ry. Co., 7 Cir. 171 F.2d 594.

■ To return to a consideration of Award 8258—before an award will be considered as prima facie evidence, it must contain precise and definite findings of fact and not a legal conclusion based on undisclosed findings. System Federation No. 59 of Railway Employees Department of American Federation of Labor v. Louisiana & Arkansas R. Co., 5 Cir., 119 F.2d 509; Railroad Yardmasters of North America v. Indiana Harbor Belt Co., D.C.Ind., 70 F. Supp. 914; Crowley v. Delaware & H. R. Corporation, D.C.N.Y., 63 F.Supp. 164.

It cannot reasonably be held that Award 8258 and its findings are sufficiently definite and certain as to make a prima facie case in favor of the plaintiffs in this action.

■ The defendant is furthermore not limited in its defenses to matters stated in the Award. Dahlberg v. Pittsburgh & L. E. R. Co., supra.

The defendant has called to the attention of the Court criticisms expressed by various committees appointed by the Attorney General at the request of the President of the United States in 1939 and 1947, which state in substance that the Board does not write well reasoned opinions nor does it encourage such opinions by referees; that such practice results in the accumulation of a vast number of awards that have no precedent value and prove of no assistance; that by reason of the almost telegraphic brevity of the awards it is in most instances impossible to determine the controlling facts, much less the reasoning, that prompted the award.[1]

Regardless of the criticism that has been expressed relative to the National Railway Adjustment Board or its First Division, it is a specialized agency selected to adjust controversies and well qualified to interpret questions which are intricate and technical. Elgin, J. & E. R. Co. v. Burley, supra; Order of Railway Conductors of America v. Pitney, supra.

Until such time as Congress sees fit to require the Board to approach the administration of its trust in a manner which is more thorough or complete, I do not believe the Court should depart from the rule that the effect of an award is not merely advisory but that it is comparable to expert testimony. However, there must be definite findings of fact in order to give said effect thereto.

Award 8258 is not based on facts such as have been presented in the instant case. It is useless in explaining the issue or the legal or factual elements on which the decision is based. The mere quotations of the conflicting contentions fails to give any clear picture of the controlling facts which prompted the award.

---

[1] Report of Committee transmitted to U. S. Senate January 24, 1941. Document No. 8, 77th Congress, First Session.

Emergency Board appointed by President Truman July 18, 1947, under the provisions of Railway Labor Act.

With due deference to the Board and Referee Simmons, an able jurist, I cannot attach weight or importance to Award 8258 in passing upon the merits of the action at bar.

 I, therefore, do not believe that Award 8258 justifies the sustaining of the plaintiffs' action in the instant case.

Question IV—Does payment of an award made by the National Railway Adjustment Board to the claimants involved therein, and the subsequent payment to employees similarly situated, amount to an admission of liability under the contracts in suit such as would entitle the plaintiffs to recover?—

In order to understand the circumstances under which said payments were made, it is necessary to discuss and consider the same in some detail.

Award 8258 was filed July 19, 1943, and the defendant was ordered to pay Hemphill and Wagner an additional day's pay on or before August 19, 1943, on the same basis which was paid a trainman or a yard helper for a full day's work.

Had defendant not complied with the award by paying Hemphill and Wagner on or before August 19, 1943 one additional day's yard helper's pay, which it did in August, 1943, under the provisions of the Railway Labor Act, Hemphill and Wagner could have brought suit in the District Court of the United States within two years thereafter, at which trial the findings and order of the Division would be prima facie evidence of the facts therein stated as to Hemphill and Wagner.

■ Awards of the Railroad Adjustment Board which arise under collective bargaining agreements do not become final until confirmed by the Federal District Court, and if action is taken to have the awards confirmed, the defendant railroad is entitled to be heard on objections to the award before the District Court. Order of Railroad Telegraphers et al. v. New Orleans, T. & M. Ry. Co., D.C., 61 F.Supp. 869; 45 U.S.C.A. § 153, subd. 1(p).

Only Hemphill and Wagner could have brought an action on the basis of said award. No other trainman was a party to the proceedings, nor was there any reference in the claim that it was brought on behalf of any other trainman or trainmen. The award ran to the benefit of Hemphill and Wagner alone, and to no other individual, individuals or group.

By reason of the provisions of Award 8258, during the latter part of 1944 other employees of defendant, but not all of the plaintiffs, having claims of a similar nature, received an additional day's pay for each day on which they coupled air hose at points where a car inspector was available.

The plaintiffs contend that the actions of the defendant subsequent to the award amounts to an admission of liability under the contracts at suit for the following reasons:

(a) The payment of Hemphill and Wagner by the defendant.

(b) The defendant's officer's admission that they knew it would be useless to contest the question by future cases before the Board.

(c) The fact that at no time was the defendant willing to test the question in the courts.

(d) Even if there were nothing else in the case, liability as to all trainmen in similar circumstances to Hemphill and Wagner has been established under the principle "He who pays is presumed to owe."

Defendant contends that it was the first time in its history that defendant ever paid a trainman an additional day's pay for coupling air hose. While making that payment, defendant believed the award to be wrong, but in yielding to the Board's order defendant adhered to a policy of paying all awards irrespective of whether they were right or wrong. Notice of the payment of Award 8258, and other awards, was sent by defendant on October 18, 1943 to the general chairmen of both the BRT and ORC. There were no further payments of air hose claims thereafter until November, 1944.

A few months prior to October of 1943, the bargaining representative, BRT, had notified the defendant that it desired to open the 1928 Contract and negotiate a new one, and the defendant agreed thereto.

Although the BRT requested many changes in the 1928 Contract, the only change requested in the air hose rule was

that "employed" be substituted for "available;" there was no suggestion even then of the addition of a penalty provision (this was before Award 8258). Conferences began on the contract revision on May 24, 1943 and continued thereafter. The union's representatives, not being satisfied with the progress of the negotiations, requested the assistance of a grand lodge officer on October 7, 1943.

Taking full advantage of Award 8258 and the time slips that were already filed, on October 13, 1943 the BRT general chairman for the first time approached management and preliminarily discussed the payment of trainmen in view of the award. Defendant made a study to ascertain the number of additional car inspectors needed to avoid the broad implications of a literal application of the award, as a result of which it was estimated that twenty-four additional car inspectors were required daily to eliminate the necessity of trainmen coupling air hose.

The defendant insists that although it believed the award was an erroneous interpretation of the contract. It was fully aware of the power and inclination of the organization to insist on compliance with it and the principle for which it stood.

That although, theoretically, the defendant did not need to comply with the award until an action was brought in court to enforce the same, the theory does not accord with the fact, however, because in practice the unions are usually sufficiently strong that they can use their economic power to enforce the awards without going to court. The defendant realized the award was practically enforceable by the union without going to court.

For these reasons the defendant proposed to the representatives of the employees, the BRT and later the ORC, that some amicable settlement be made of the various claims for coupling air hose where a car inspector was available.

Many conferences were held and communications had relative thereto with the highest officials of both parties, all of which were to no avail. As a result thereof, a deputy president of the BRT was assigned to assist in working out a new contract and to adjust the question relative to the coupling of air hose by trainmen, the compensation to be paid for claims which then existed, and the compensation to be paid for similar services to be performed in the future.

The parties were unable to reach an agreement and on October 2, 1944, at the request of the bargaining representatives, President Whitney of the BRT authorized the various lodges to take a strike ballot.

Faced with this dreadful prospect of having its trains stopped in time of war, defendant sought a conference with President Whitney to remove that possible calamity. Representatives of management and the BRT met with President Whitney in Cleveland, at which meeting it was agreed to return to the property and attempt to iron out the difficulties.

Negotiations resumed but they again broke down and on October 24, 1944, President Whitney of the BRT authorized the presentment to the various lodges of a strike ballot. Representatives of the BRT then informed management of the procedure about to be followed and submitted two alternatives to management, (1) either satisfy us on these matters, or (2) a strike vote will be taken.

Unquestionably there would be considerable tenseness and strain attached to such an eventuality arising. The gravity of the situation was multiplied by the necessity of maintaining uninterrupted service while this country was at war. I do not think the strike threat was an idle and inconsequential gesture, but, regardless of whether the bargaining representatives would have actually submitted a strike ballot or not, a new contract was negotiated and executed which disposed of the differences which existed.

Since the basis for disposing of all past claims for coupling air hose was inextricably entwined with the basis which would govern similar claims for coupling air hose in the future, it was necessary to consider both past and future situations on the same basis.

Consideration has not additionally been given at this time to the most unusual, questionable and suspicious disappearance

and loss of many claims which had been filed by trainmen for coupling air hose, which had been entrusted by the defendant to one of its executive or administrative office employees for review and approval. The reason for not considering this situation will appear later herein.

On the basis of the settlement agreement various claims of trainmen were approved for coupling air hose, and payment was made by the defendant on said basis commencing in April, 1945.

The plaintiffs contend the payments which were made under the circumstances that I have related is an explicit admission of liability to the plaintiffs in the matter now at issue.

■ Consideration must, therefore, be given to the rule which holds that one who pays is presumed to owe. Where payment is made of a debt or claim, a rebuttable presumption arises that the transaction constitutes payment thereof. 48 Corpus Juris, Section 221, page 704; Gilinger v. Kulp, 5 Watts & S., Pa., 264; Abbott v. Lyon, 4 Watts & S., Pa., 38, 39.

■ Offers of compromise to pay a sum of money by the way of compromise, as a general rule, are not admissible against the party making the offer, but, if admitted, it is clear that the offer is open to explanation regardless of how made. West v. Smith, 101 U.S. 263, 273, 25 L.Ed. 809.

■ The rule is established that an admission made during or in consequence of an effort to compromise is admissible, but that an offer to do something by the way of compromise, such as to pay a sum of money and the like, shall be excluded. Payment of money by way or in furtherance of a compromise cannot be called an admission, since it was done to avoid a controversy or to avoid litigation. West v. Smith, supra; Cooper v. Brown, 3 Cir., 126 F.2d 874, 878.

Even if it be assumed that payments which were made amount to prima facie evidence of liability, the circumstances were such, in my judgment, to satisfactorily explain the reasons therefor and rebut the presumption of an admission of liability.

The payment to trainmen, and those who were similarly situated to the plaintiffs, after the settlement or compromise agreement cannot be construed as an admission of liability. West v. Smith, supra; Cooper v. Brown, supra.

■ An offer of settlement or an accomplished settlement is not evidence of liability and proves nothing but that peace was brought. McCloskey & Co. v. Eckart, 5 Cir., 164 F.2d 257.

■ The sufficiency of the consideration for a compromise is not to be determined by the soundness of the original claim of either party. The very object of compromise is to avoid the risk or trouble of that question. Zentmyer v. Zentmyer, 69 Pa.Super. 496. Courts favor compromises and settlements. Kehoe v. C. I. R., 3 Cir., 105 F.2d 552.

The plaintiffs further contend:

(1) That sometime in 1945 the executives of the various railroads in the United States (including defendant) and representatives of the unions which spoke for plaintiffs agreed that, as to all past and future awards, the railroads, against which an award was rendered, would consider the award binding as to all employees similarly situated even though but one employee was named.

(2) That at all material times there was a custom or usage among railroads in the United States to treat an award of the National Railroad Adjustment Board on a complaint filed by one employee as running to the benefit of and available to all other employees similarly situated.

(3) That contrary to the alleged custom and usage plaintiffs did not receive compensation in accordance with the award for claims set forth.

It is my opinion in the present suit that the defendant at no time, either directly or indirectly, intended or agreed that Award 8258 was to govern all claims of a similar nature.

■ I have been unable to find any reported case which holds that the threat of a lawful strike has been recognized by the courts as an excuse to avoid a contract or to avoid an ordinary legal implication.

The threat to cause a legal strike is not duress. Washington Terminal Co. v. Boswell, 75 U.S.App.D.C. 1, 124 F.2d 235, affirmed 319 U.S. 732, 63 S.Ct. 1430, 87 L. Ed. 1694; McKay et al. v. Retail Automobile Salesmen's Local Union No. 1067, 16 Cal.2d 311, 106 P.2d 373, certiorari denied 313 U.S. 566, 61 S.Ct. 939, 85 L.Ed. 1525.

The defendant is not attempting to avoid the bargaining agreement executed on December 1, 1944. Explanation has been given as to why payments were made to Hemphill and Wagner, and to other trainmen similarly situated, among whom were some of the plaintiffs. The circumstances relative thereto conclusively establish that said payments were not an admission of liability by the defendant under the contracts in suit.

I do not believe the settlement and payment would have been made by the defendant if it had not been for the threat of a strike. This is not sufficient to void either the bargaining agreement effective December 1, 1944 or the compromise settlement which was effected. I do believe, however, it explains why the payments were made and establishes that it was not an admission of liability to trainmen similarly situate or to any of the plaintiffs. Howard v. Thompson, D.C., 72 F.Supp. 695, 702.

Collective bargaining to be successful must result in real contracts, binding as such on all the parties and to be enforced as written. If either party can dictate the result by its "economic power," or by a threat to exercise that power, rather than by law and reason, what was intended to be a contract is converted into a mere deceptive bit of paper and collective bargaining thwarted of its essential purpose.

In conclusion, it may be said with frankness and it is hoped with propriety also, that in this matter the Court has tried its best to act judicially and not as mere mediator or arbitrator. It has considered the schedule as a contract to be interpreted and applied by the same standards of decisions as other written contracts. If such agreements are not to be so interpreted and applied, they are not contracts.

Under all the circumstances I do not believe that payment of Award 8258 to Hemphill and Wagner, or to employees similarly situate, amounted to an admission of liability under the 1928 or 1936 Contract.

Coupling air hose is not even now outside the field of service of trainmen, for under the current contract trainmen are explicitly required to couple air hose in many circumstances without any right to additional compensation. If coupling air hose were outside the duties of the craft of trainmen, they could not be compelled to perform that function under any circumstances.

In connection with questions or issues V to VIII inclusive—

Question V. Does the settlement agreement executed by the bargaining representatives of the trainmen with the defendant relating to claims for air hose couplings bar the plaintiffs' right to recover where—

(a) Plaintiff trainmen were members of said bargaining agency (BRT)?

(b) Plaintiff trainmen were not members of said bargaining agency?

Question VI. Does the failure of plaintiff trainmen to comply with the terms of said settlement agreement relating to services performed for air hose coupling bar them from the right to recover where—

(a) Plaintiff trainmen were members of said bargaining agency (BRT)?

(b) Plaintiff trainmen were not members of said bargaining agency?

Question VII. Does the acceptance by plaintiff trainmen of payments made by defendant, under the provisions of said settlement agreement for coupling of air hose, bar their right to recover and amount to an accord and satisfaction?

Question VIII. Does the failure of plaintiff trainmen, who were members of the BRT, to follow the grievance procedures prescribed by the Constitution and By-Laws of said organization bar their right to recover?

it is not necessary to consider or decide the same in view of the conclusion which has been reached—That under all of the theories advanced by the plaintiffs, none of them are entitled to recover against the defendant, Pittsburgh and Lake Erie Railroad Company, a Pennsylvania corporation.

There has been an admission of liability by the defendant to several of the plaintiffs, not under the contracts or any theory advanced by the plaintiffs, but by virtue of the agreement executed between the defendant and the bargaining representatives of the trainmen.

Judgment will, therefore, be entered against the defendant, Pittsburgh and Lake Erie Railroad Company, a Pennsylvania corporation, and in favor of the following plaintiffs:

| | |
|---|---|
| C. P. Crane | $498.56 |
| R. J. Knechtel | 427.42 |
| F. E. Westcott | 121.64 |
| A. Gasper | 26.04 |
| C. Gough | 6.53 |
| R. C. Harris | 13.85 |

Judgment is also entered against the defendant, Pittsburgh and Lake Erie Railroad Company, a Pennsylvania corporation, for the costs.

The Court makes the following
Findings of Fact:

1. Plaintiffs who were Road Conductors and worked exclusively as Road Conductors between April 10, 1940 and December 1, 1944 were governed by the terms and provisions of the 1936 Contract.

2. Plaintiffs who come under this category are:

Abraham B. Fine
R. T. Lynch
J. R. Nicholson

3. Plaintiffs who were Conductors and worked as Road Conductors on some days and as Yard Foremen on other days during the period from April 10, 1940 to December 1, 1944 were governed by the terms and conditions of the 1936 Contract when they worked as Road Conductors, and were otherwise governed by the terms and conditions of the 1928 Contract; and subject to the extent, if any, when they worked as Yard Foremen after November 2, 1944.

4. The plaintiffs who come under this category are:

| | |
|---|---|
| L. R. Acton | W. H. Eichelburger |
| Richard P. Adams | A. W. Fieldson |
| H. R. Allshouse | William A. Kloes |
| Wm. J. Baltes | L. M. Lucas |
| R. E. Brill | J. A. Miller |
| H. O. Broders | S. E. Puffenbarger |
| T. W. Bunce | J. T. Rodibaugh |
| Robert W. Gray | Nathan Siegel |
| Stanley F. Doak | Vincent J. Walters |
| D. W. Earle | John Whitfield. |

5. Plaintiffs who were qualified Road Conductors and worked as Road Conductors in Work Train Service during the period April 10, 1940 to December 1, 1944, while working as Road Conductors in such service, were governed by the terms and conditions of the 1936 Contract.

6. Plaintiffs who come under this category are:

| | |
|---|---|
| John W. Bailey, Jr. | R. J. Knechtel |
| R. D. Bell | Floyd R. Martin |
| C. J. Confoey, Sr. | J. R. Patterson |
| S. A. Coughanour | Harold S. Powell |
| John W. Cypher | Charles E. Ramsey |
| Leo A. Donovan | William G. Ritter |
| W. J. Evans | Edw. E. Roler |
| C. Gough | S. E. Shipley |
| Lester B. Harper | Frank L. Shirilla |
| D. P. Harshbarger | Charles S. Strausbaugh |
| Charles H. Herbert | Harold J. Witherow |
| John F. Kessler | Wallace L. Wright |

7. All other plaintiffs were governed by the terms and conditions of the 1928 agreement; and subject to the extent, if any, of the modification of the contract of November 2, 1944 with regard to work done after that date.

8. The plaintiffs who come under this category are:

| | |
|---|---|
| John Back, Jr. | W. T. Brydebell |
| Clarence Bierkamp | Guy R. Burkey |
| J. J. Bishton | G. H. Bushyager |
| J. A. Boland | Charles C. Campbell |
| F. A. Bond | William R. Campbell |
| Edward C. Braheny | D. L. Childers |
| Mark D. Brandon | Howard S. Craft |
| Philip F. Brindle | Claude W. Crain |
| Theodore A. Broders | Charles P. Crane |
| Frank D. Cuccarese | F. T. Magee |
| Benjamin F. Davis | Jos. C. Miller (dec'd) |
| James J. Diffley, Jr. | V. J. Modarelli |
| John C. Dulin | George T. Murphy |
| B. B. Durrett | Don R. Myers |
| Wm. A. Durrett | Charles B. Nestor |
| L. C. Edenfield | Raymond J. Nicholson |
| Tim H. Edmiston | Glenn A. Parker |
| J. V. Flaherty | George S. Patton |
| William R. Forker | Donald E. Phillis |
| L. D. Fowler | William G. Piehl |
| C. E. French | George S. Piper |
| Harry C. Fulmer | Harold C. Reed |
| Adolph Gasper | Chas. L. Renzenbrink |
| Robert G. Gilbert | Ray G. Ritson |
| Roy Goss | I. E. Roarity |
| Eugene R. Graham | Charles Roberts |
| R. M. Grier | John P. Ryan |
| R. J. Hamilton | Walter R. Salton |
| O. L. Hawk | Harold Setley |
| R. C. Harris | Clyde D. Shipley |
| A. L. Harsbarger | John Slavins |
| W. C. Henderson | Grover C. Taylor |
| Fred G. Keller | M. C. Thompson |

John L. Kilch
D. E. Kooker
Nicholas Kusic
Anthony Lacivite
Frank C. Langebacher
C. G. Leiser
William P. Lutes
E. M. Manford
Thomas E. McCann
Thos. E. McCormick

Ward P. Unger
S. R. Uplinger
Dorsie D. Urbach
C. E. Warren
F. E. Westcott
Delmar A. Wilhelm
R. Williams
Harry Workman
R. E. Workman
Lawrence G. Ziegler

9. The terminology used in railroad contracts, including the 1928 and 1936 Contracts, is peculiar and unique to the railroad industry, and some of the ordinary words used therein have specialized meanings within the context or framework of railroad practice.

10. The Pittsburgh and Lake Erie Railroad Company, defendant, is unique among the class one railroads of the United States in that the approximately one hundred sixty-eight (168) miles of main line of the railroad are, and were at all material times, divided into (9) contiguous general yards, the longest of which is and was 30.9 miles in length.

11. Each general yard contains smaller yards, which in turn are frequently divided into even smaller yards.

12. A yard, as distinguished from a general yard, consists of one or more tracks used for the make up and classification of trains.

13. Crews operating freight trains (except engine service employees) are known as trainmen and are designated as being in yard service when they work on trains within the switching limits of a general yard, and as being in road service when they work on trains taking them outside the switching limits of a general yard.

14. The primary function of both yard and road crews is to directly handle the picking up, setting off and switching of cars. In this process at times it is necessary to couple the air hose between cars.

15. The process of coupling air hose normally takes less than a half a minute.

16. Each of the plaintiffs in this action is required to couple air hose at some point where car inspectors were employed or available in a general yard during the period April 10, 1940 to December 1, 1944, on the defendant railroad, and has not received an additional day's pay therefor.

17. At all times involved in this action, that is between the dates April 10, 1940 to December 1, 1944, the defendant railroad had at least one car inspector working in each general yard during each shift.

18. Car inspectors are located at many but not at all points within a general yard. Their duties are to inspect cars for defects and to make minor repairs. About ten percent (10%) of a car inspector's time is spent coupling air hose.

19. The rules of the defendant railroad require a car inspector to blueflag the track and lock the switch when he is coupling air hose.

20. No provision was made for the trainmen required to couple air hose, to blueflag the track or lock the switch.

21. To couple air hose with a blueflag and locking the switch makes that work less dangerous to the workman than it would be without the blueflag or lock.

22. Trainmen have been coupling air hose on the defendant railroad from prior to 1915 to date in yards where car inspectors are and were employed and are and were given instructions, including mandatory instructions on the entire air brake system, on how to couple air hose when they were first employed.

23. Coupling of air hose where car inspectors are employed or available since December 1, 1944 and at the present time is considered the work of trainmen, without compensation, under the following circumstances:

(a) Cars doubled from one track to another.

(b) Between engine and first car.

(c) Last car and caboose (engine peddler service).

(d) Work trains.

(e) Wreck trains.

(f) Hot metal job at East Youngstown.

24. In 1914 the first air hose rule was proposed to management by a joint committee consisting of the representatives of the Brotherhood of Railroad Trainmen and the Order of Railway Conductors, which unions were the duly constituted bargaining representatives for the trainmen as a craft. This proposal contained a penalty provi-

sion of a minimum of two (2) hours' pay. The penalty provision was later withdrawn by the unions and the word "available" was substituted at management's insistence for the proposed word "stationed."

25. A rule covering all trainmen on defendant railroad when it first appeared in any working agreements between defendant and trainmen read as follows in the 1915 Contract:

"2. (a) At points where car inspectors or air inspectors are available, trainmen and yardmen will not be required to couple air or steam hose."

26. Management and the unions intended that there should be no monetary penalty if the rule was violated.

27. The interpretation placed by the parties to the contract on the word "point" was the assigned area in which a car inspector normally performed his duties, having as its center the place where he kept his tools and reported for work and extended along the tracks in either direction one train length.

28. The interpretation placed by the parties to the contract on the word "available" was that for a car inspector to be available he must be physically present in his assigned area and not actually engaged in any other activity.

29. The reason the unions insisted on the inclusion of an air hose rule in the contract was not to receive additional compensation or to relieve trainmen from this type of work, but to compel car inspectors to assist trainmen by coupling air hose if they were available.

30. A new agreement was negotiated in 1920 by the same parties covering all trainmen on defendant railroad, which agreement relating to air hose coupling read as follows:

"(c) At points where car inspectors or air inspectors are available, trainmen will not be required to couple air or steam hose."

31. The same interpretations were placed on this provision as had been agreed to in the 1915 Contract. A penalty provision to the air hose rule was not proposed by the employees' representatives.

32. A new agreement was negotiated in 1924 by the same parties covering all trainmen on defendant railroad, which agreement relating to air hose coupling read the same as that appearing in the 1920 Contract.

33. A penalty provision to the air hose rule was not proposed by the employees' representatives; it was the intention of the parties that there be no penalty. The same interpretations were placed on this provision as had been agreed to in the 1915 and 1920 contracts.

34. A new agreement was negotiated in 1928 by the same parties covering all trainmen on defendant railroad, which agreement relating to the coupling of air hose read the same as that appearing in the 1920 and 1924 Contracts. The same interpretations were placed on this provision as had been agreed to in the 1915, 1920 and 1924 Contracts.

35. Although other penalty provisions were added to the 1928 Contract, a penalty provision to the air hose rule was not proposed by employees' representatives; it was the intention of the parties that there be no penalty. The only change suggested by the unions in the air hose rule was that the word "stationed" be substituted for the word "available," which management refused to agree to.

36. The air hose rule in the 1928 Contract applied to all trainmen, with the exception of road conductors acting as such, at all times during the period in controversy until November 3, 1944.

37. Following an election held under the direction of the National Mediation Board in 1935, the Order of Railway Conductors was certified as the collective bargaining representative for road conductors and yard foremen. In 1936, management and the Order of Railway Conductors entered into an agreement which contained the same air hose provision as appeared in the 1915, 1920, 1924 and 1928 joint contracts, the only variation being in the designation of the individuals covered by the contract. This contract contained no penalty provision in connection with the air hose rule, nor was one intended. The same interpretation was placed on the air hose rule in

the 1936 Contract as had been placed on the air hose provision in the 1915, 1920, 1924 and 1928 Contracts.

38. In 1938, as a result of another election held under the direction of the National Mediation Board, the Brotherhood of Railroad Trainmen was certified to represent yard foremen with the result that for the purposes of this case the Order of Railway Conductors represented only road conductors acting as such until 1945.

39. In 1940, following the mandate of the President of the Brotherhood of Railroad Trainmen, negotiations were begun between management and the general grievance committee of the Brotherhood of Railroad Trainmen on a new contract, but the only suggested change in the air hose rule requested by the general grievance committee was to substitute the word "employed" for the word "available."

40. All claims for money by trainmen against defendant were made on time slips.

41. Although the air hose rule had been in trainmen's contracts since 1915 and trainmen had coupled air hose daily prior to and since that time, it was not until March, 1941 that any trainmen, or any union on behalf of a trainman, processed a claim asking for additional compensation for coupling air hose.

42. Prior to March, 1941, what complaints there had been regarding the coupling of air hose by trainmen were in the nature of complaints by trainmen asking that carmen be required to assist in coupling air hose when they were available, and these protests had been satisfactorily adjusted between trainmen or their representatives and yardmasters without going to any higher officers of defendant, with a single exception in 1934 or 1936 and this claim was not processed by either the individual or his bargaining representative with the defendant.

43. On March 16, 1941, two trainmen, Hemphill and Wagner, filed time slips for themselves alone asking for an additional day's pay for coupling air hose.

44. This claim was processed by the Brotherhood of Railroad Trainmen general grievance committee in accordance with the grievance procedure in the 1928 contract (Article 17—Complaints) up to defendant's general manager and was consistently denied by defendant.

45. In accordance with the provisions of the Railway Labor Act, the Brotherhood of Railroad Trainmen general grievance committee referred this dispute to the First Division of the National Railroad Adjustment Board. In preparing its written submission to the Board, the union relied solely on Article 11(a), (b) and (c) in the 1928 Contract and made no mention of Article 44, the basic day rule.

46. During the course of two days, July 30 and 31, 1942, the First Division of the National Railroad Adjustment Board heard more than sixty claims against defendant, including the Hemphill-Wagner claim, which claims were urged by either the Order of Railway Conductors or the Brotherhood of Railroad Trainmen general grievance committees. Representatives of management, Order of Railway Conductors and Brotherhood of Railroad Trainmen were present at the hearing.

47. The parties were limited in their oral argument to their written submissions, so that neither the basic day rule nor the history of the 1928 air hose rule was brought to the Board's attention.

48. Without further notice to or hearings attended by either management or the union representatives, Referee Simmons, who had been appointed by the National Mediation Board to break a deadlock existing among the regularly constituted members of the Board, on July 19, 1943 handed down his decision on the claim of Hemphill-Wagner—Award 8258. On the same day the Board ordered defendant to pay Hemphill and Wagner an additional day's pay by August 19, 1943.

49. Award 8258 fails to state why compensation of an additional eight hours was granted, and a reading of the award fails to disclose any basis for allowing damages.

50. Although believing the award to be erroneous, the defendant, without consulting counsel, paid this award in accordance with its policy of paying all such awards.

51. Early in 1943, other trainmen began to file time slips requesting additional compensation for coupling air hose.

768

52. When Award 8258 was handed down, it promptly became common knowledge among trainmen throughout defendant railroad, both union (Brotherhood of Railroad Trainmen and Order of Railway Conductors) and non-union trainmen alike.

53. Where there is a possibility of a trainman receiving additional compensation, news of that sort is quickly disseminated among the men.

54. After Award 8258 was handed down, trainmen began to file time slips for air hose coupling in ever increasing volume.

55. On April 27, 1943, the general grievance committee of the Brotherhood of Railroad Trainmen served a thirty day notice on defendant to revise the 1928 Contract. It had earlier obtained the requisite constitutional approval of the majority of the Brotherhood of Railroad Trainmen lodges to enter into negotiations for the revision of the contract.

56. On May 10, 1943, defendant sent its thirty day notice to the general chairman of the Brotherhood of Railroad Trainmen.

57. On October 13, 1943, the Brotherhood of Railroad Trainmen general committee met with management and for the first time urged that the principle contained in Award 8258 be applied to other trainmen.

58. Thereafter, although management believed Award 8258 to be a misinterpretation of the air hose rule, management offered to dispose of the question by paying yard crews various arbitraries based on the number of couplings performed in a single day.

59. During the latter part of 1943 and well into 1944, many conferences were held at defendant's office in Pittsburgh between management and the Brotherhood of Railroad Trainmen general grievance committee regarding the air hose coupling question, including meetings which were attended by the general chairmen and the local committeemen of the Brotherhood of Railroad Trainmen, Order of Railway Conductors, Brotherhood of Locomotive Engineers and Brotherhood of Locomotive Firemen and Enginemen.

60. Since the Brotherhood of Railroad Trainmen was the certified bargaining agent for the craft covered by the 1928 Contract, management dealt with it alone in revising that contract.

61. In August, 1944, at the request of the Brotherhood of Railroad Trainmen general grievance committee, Deputy President Chase was assigned to assist the local committee in its negotiations for the revision of the 1928 Contract, settlement of the air hose claims and other matters.

62. Thereafter, negotiations continued until September 23, 1944 when the general grievance committee requested authority from the president of the Brotherhood of Railroad Trainmen to take a strike vote because of the failure of management to satisfy the demands of the general grievance committee with respect to revision of the 1928 Contract, settlement of the air hose question and other matters.

63. After conferring with the Brotherhood of Railroad Trainmen president in Cleveland, Ohio, the parties met again on the railroad property and held further conferences, but on October 24, 1944, again at the request of the general grievance committee, president of the Brotherhood of Railroad Trainmen authorized another strike vote.

64. Even throughout World War II the Brotherhood of Railroad Trainmen insisted that the railroads must comply with what the brotherhood interpreted the principles of the Railroad Adjustment Board's awards to be and was not hesitant to use its economic strength, i. e., to strike, to compel such compliance.

65. The general grievance committee of the Brotherhood of Railroad Trainmen informed management that it had authority from the president of the Brotherhood to take a strike vote if all matters were not adjusted to the satisfaction of the general grievance committee.

66. The serious threat of an imminent strike while the nation was at war persuaded management that some settlement of the air hose claims and a revision of the air hose rule must be reached.

67. On November 2, 1944, both management and the general grievance committee agreed on a revision of the air hose rule which for the first time provided for: an

arbitrary payment where trainmen were required to and did couple air hose at points where car inspectors were available.

68. Copies of this written agreement were sent on November 2, 1944 to all general yardmasters and trainmasters, together with a notice, as suggested by Brotherhood of Railroad Trainmen's Deputy President Chase, to be posted on all bulletin boards where trainmen report for and leave their work. This notice was posted on all such bulletin boards and in substance informed trainmen that except when they coupled air hose while on work trains, wreck trains, hot metal run, engine peddler service, between the engine and first car or while doubling, they were required to first obtain directions from a yardmaster to perform such couplings.

69. All claims for coupling air hose, which couplings were performed from November 3 to December 2, 1944, were treated as current claims and were paid in accordance with the understanding reached on November 2, 1944.

70. The nationwide custom or usage among railroads, including the defendant, has been fixed and riveted for at least twenty some years and probably for a half century, that upon each day when a trainman is required to perform duties outside of his craft or other than his regularly assigned duties, and there is no arbitrary in his contract advancing a different measure of compensation, he will be entitled to an additional day's pay unless the parties to said agreement intended that no compensation would be paid.

71. When plaintiff trainmen were required to couple air hose at points where car inspectors were employed or available, during the period involved in this action, said coupling was not outside of the regularly assigned duties of the plaintiffs as trainmen.

72. When plaintiff trainmen were required to couple air hose at points where car inspectors were employed or available, during the period involved in this action, said coupling was not outside of the craft of the plaintiffs as trainmen.

73. The coupling of air hose was common to and a joint responsibility of trainmen and car inspectors.

74. Car inspectors and trainmen had coupled air hose for a long period of time prior to and during the period involved in this action.

75. Carmen or their representative bargaining agency have never complained that the coupling of air hose by trainmen was an infringement on their craft or the performance of their duties.

76. Coupling of air hose where car inspectors are available since December 1, 1944, and at the present time, requires the payment of an additional day at yardmen's pay in closed territories, but only an arbitrary of one hour at pro rata rate in open territories.

77. In many other instances trainmen couple air hose today as a regular part of their assigned duties without the payment of any compensation, even where car inspectors are employed or available.

78. If plaintiff trainmen were entitled to an additional day's pay under the 1928 or 1936 working agreements, their bargaining representatives would not have agreed to less or no compensation under some circumstances when the agreement effective December 1, 1944 was negotiated, especially where authorization existed to present a strike ballot.

The Court makes the following Conclusions of Law:

1. The Court has jurisdiction in this action by reason of the diversity of citizenship between the original plaintiffs and the defendant, and because the amount involved as to each original plaintiff is alleged to exceed $3,000 exclusive of interest and costs.

2. The Court, in the exercise of its discretion in a spurious class action, has jurisdiction as to the intervening plaintiffs since a common question of law existed with the original plaintiffs, although the intervening plaintiffs did not possess the jurisdictional requirements of diversity of citizenship and a claim in excess of $3,000 exclusive of interest and costs.

3. The Court does not have jurisdiction in this claim under the provisions of the Interstate Commerce clause of the Constitution and the provisions of the Railway Labor Act.

4. For the purposes of collective bargaining, the Order of Railway Conductors represented road conductors while they were working as road conductors during the period involved in this suit.

5. Road conductors while they were working as road conductors were governed by the terms and conditions of the 1936 Contract.

6. For the purposes of collective bargaining, the Brotherhood of Railroad Trainmen represented all other trainmen during the period involved in this suit.

7. Trainmen, with the exception of road conductors while they were working as road conductors, were governed by the terms and conditions of the 1928 Contract up to and including November 2, 1944.

8. The terminology used in railroad contracts, including the 1928 and 1936 Contracts, is peculiar and unique to the railroad industry, and some of the ordinary words used therein have specialized meanings within the context or framework of railroad practice.

9. Under the circumstances in this case, great weight should not be given by the Court to the findings of the First Division, National Railroad Adjustment Board in Award No. 8258.

10. Each of the plaintiffs in this action was required to couple air hose at some point where car inspectors were employed or available, during the period April 10, 1940 to December 1, 1944, on the defendant railroad, and has not received his additional day's pay therefor.

11. The plaintiff trainmen who were required to couple air hose during the period covered by this action, where car inspectors were employed or available, in so coupling air hose were performing their regularly assigned duties; and on such occasions and in so doing, they were not working outside of their craft.

12. The coupling of air hose was common to and part of the regular assigned duties of trainmen and carmen.

13. The coupling of air hose was not common to any particular craft, and on the contrary was recognized in the craft of both trainmen and carmen.

14. The nationwide custom or usage among railroads, including the defendant, has been fixed and riveted for at least twenty some years and probably for a half century; that upon each day when a trainman is required to perform duties outside of his craft or other than his regularly assigned duties, and there is no arbitrary in his contract advancing a different measure of compensation, he will be entitled to an additional day's pay unless the parties to said agreement intended that no compensation would be paid.

15. The parties to the 1928 and 1936 Contracts did not recognize or intend that a nationwide custom and practice to pay an additional day's compensation, where an operating employee worked outside of his regular assigned duties, should be a part of said contracts and apply to the coupling of air hose.

16. The 1928 and 1936 Contracts do not specifically provide that where a trainman is required to couple air hose at points where a car inspector is available, the trainman will receive an additional day's pay for each day upon which he is required to couple air hose.

17. On the basis of Award 8258 of the National Railroad Adjustment Board, none of the plaintiffs is entitled to recover.

18. On the basis of the payment of Award 8258 of the National Railroad Adjustment Board to the claimants therein, none of the plaintiffs is entitled to recover.

19. The plaintiff trainmen who were required to couple air hose in any general yard of the defendant where car inspectors were employed or available, are not entitled to an additional day's pay for each day upon which they were so required to couple air hose.

20. Under the terms and provisions of the settlement agreement negotiated and executed by the bargaining representatives

of the plaintiff trainmen, contemporaneous with the Contract effective December 1, 1944, judgment is entered against the defendant, Pittsburgh and Lake Erie Railroad Company, a Pennsylvania corporation, together with costs, in favor of—

| | |
|---|---|
| C. P. Crane | $485.56 |
| R. J. Knechtel | 427.42 |
| A. Gasper | 16.04 |
| F. E. Westcott | 121.64 |
| R. C. Harris | 13.85 |

An appropriate order will be filed.